STATE OF NORTH CAROLINA v. JEFFREY CLAYTON KANDIES

No. 197A94

(Filed 9 February 1996)

1. Jury § 248 (NCI4th)— jury selection—peremptory challenges—racial discrimination

Both the federal and state constitutions prohibit peremptorily challenging prospective jurors solely on the basis of their race. In *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986) the United State Supreme Court set out a three-pronged test; first, a criminal defendant must make out a prima facie case of discrimination by demonstrating that the prosecutor exercised peremptory challenges on the basis of race and that this fact and other relevant circumstances raise an inference of discrimination, but here that question need not be addressed because the prosecutor voluntarily gave reasons for the dismissal of each juror in question; the State must articulate legitimate reasons which are clear and reasonably specific and related to the particular case to be tried which give a neutral explanation for challenging jurors of the cognizable group, but these reasons need not rise to the level justifying exercise of a challenge for cause; and finally, the trial court must "determine whether the defendant has carried his burden of proving purposeful discrimination." The findings of the trial court, which largely turn on credibility, are to be given great deference and are not to be overturned unless the appellate court is convinced that the determination was clearly erroneous. Factors include the susceptibility of the case to racial discrimination; whether the State used all of its peremptory challenges; the race of the witnesses; questions and statements by the prosecutor during jury selection; whether the State accepted any black jurors; and whether similarly situated whites were accepted. An examination of the actual explanations given by the district attorney is a crucial part of the test.

Am Jur 2d, Jury § 244.

Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.

Use of peremptory challenges to exclude ethnic and racial groups, other than black Americans, from criminal jury—post-*Baston* state cases. 20 ALR5th 398.

STATE v. KANDIES

[342 N.C. 419 (1996)]

2. Jury § 260 (NCI4th)— capital murder and rape—jury selection—peremptory challenges—racial discrimination

In a first-degree murder prosecution where the defendant is white, the victim was white, several witnesses are white and the prosecutor accepted three black jurors when he had peremptory challenges remaining, the trial court did not err in overruling defendant's objection to the State's excusal of black potential jurors Randleman, Jinwright, and Massey where the prosecutor stated that Randleman was hesitant on the death penalty and her juror questionnaire indicated no convictions but her record indicates a conviction for worthless checks and two speeding violations; Jinwright worked with three- and four-year-old children and was hesitant on the death penalty question; Massey was hard of hearing and had difficulty understanding questions; and defendant made no further showing at trial regarding these jurors. Defendant's approach of finding a single factor among the several articulated by the prosecutor and matching it to a passed juror is rejected.

Am Jur 2d, Jury §§ 234, 244, 264, 279.

Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.

Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.

3. Jury § 260 (NCI4th)— capital murder and rape—jury selection—peremptory challenges—racial discrimination

In a first-degree murder prosecution where the defendant is white, the victim was white, and several witnesses are white and the prosecutor accepted three black jurors when he had peremptory challenges remaining, the trial court did not err in overruling defendant's objection to the State's excusal of black potential jurors Rawlinson and McClure where the prosecutor stated that a source within the High Point Police Department indicated that they would not be good jurors for this case because they were weak on the death penalty, a court officer noticed McClure nodding off at least twice during *voir dire*, and the trial court noted that the prosecutor passed a minority juror called as a replacement.

Am Jur 2d, Jury §§ 234, 244, 264, 279.

STATE v. KANDIES

[342 N.C. 419 (1996)]

Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.

Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.

4. Jury § 260 (NCI4th)— capital murder and rape—jury selection—peremptory challenges—racial discrimination

In a first-degree murder prosecution where the defendant is white, the victim was white, several witnesses are white and the prosecutor accepted three black jurors when he had peremptory challenges remaining, the trial court did not err in overruling defendant's objection to the State's excusal of black potential jurors Campbell, Hines, and Wilson where the prosecutor stated that he excused Campbell because Campbell stated that he did not believe in the death penalty and a record check indicated that a person named Fred Campbell had a prior common law robbery conviction; Hines was dismissed because he was worried about his employment and loss of income, he had never thought about the death penalty, and the State's records indicated that he had prior convictions for driving while impaired and driving while license revoked even though he denied it; and the prosecutor excused Wilson because it appeared that he had a record of reckless driving, driving while impaired, four worthless checks, two injury to personal property convictions, a simple assault, and assault by pointing a gun. A juror's criminal history is a sufficiently neutral reason to challenge that juror.

Am Jur 2d, Jury §§ 234, 244, 264, 279.

Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.

Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.

5. Jury § 260 (NCI4th)— capital murder and rape—jury selection—peremptory challenges—no racial discrimination

In a first-degree murder prosecution where the defendant is white, the victim was white, several witnesses are white and the prosecutor accepted three black jurors when he had peremptory challenges remaining, the trial court did not err in overruling

defendant's objection to the State's excusal of black potential juror Oliver where the prosecutor explained that Oliver appeared to have trouble hearing, as evidenced by her failure to heed the court's instruction about not watching television and not listening to any radio broadcasts concerning this case; the prosecutor was concerned that she would have difficulty hearing and under-standing as the trial proceeded; and the trial court noted Oliver's inability to hear the prosecutor's questions without requesting clarification on numerous occasions during *voir dire*.

**Am Jur 2d Jury §§ 234, 244, 264, 289.**

**Use of peremptory challenge to exclude from jury per-sons belonging to a class or race. 79 ALR3d 14.**

6. **Criminal Law § 107 (NCI4th)— jury selection—potential jurors—criminal records—not subject to disclosure by state**

The trial court did not abuse its discretion in a first-degree murder prosecution in which the State asserted that it challenged prospective black jurors because they failed to disclose a crimi-nal record by denying defendant's motion to require the State to produce copies of criminal records of prospective jurors. There is no statutory requirement that a prosecutor reveal juror informa-tion in his possession; absent evidence to the contrary, it is not unreasonable for the trial court to assume that the prosecutor is telling the truth with regard to the criminal records of prospec-tive jurors; and defendant could have obtained a record check himself or secured a court order requiring production of these documents. There were resources available to defendant to rebut the State's explanations, and he chose not to utilize them.

**Am Jur 2d, Jury §§ 234, 238, 264.**

7. **Jury § 215 (NCI4th)— capital murder—jury selection—consideration of life imprisonment**

The trial court did not err during jury selection in a first-degree murder prosecution by failing to excuse a juror for cause where the juror initially responded that life imprisonment for first-degree murder was not fair to the public, but after subse-quent questioning said that he could put aside his prejudice and follow the law as instructed.

**Am Jur 2d, Jury § 279.**

STATE v. KANDIES

[342 N.C. 419 (1996)]

8. **Jury § 148 (NCI4th)— capital murder—jury selection— defense questions regarding capital punishment—improper staking out**

The trial court did not err during jury selection for a first-degree murder prosecution by sustaining objections to certain defense questions pertaining to jurors' views on capital punishment because the questions were an improper attempt to "stake out" the jurors and determine what kind of verdict the jurors would render under a given set of circumstances.

**Am Jur 2d, Jury §§ 205, 279.**

9. **Jury § 115 (NCI4th)— capital murder—jury selection— objections to defense questions sustained—no abuse of discretion**

There was no abuse of discretion in a first-degree murder prosecution involving the death of a four-year-old girl where the trial court repeatedly sustained the prosecutor's objections to defense questions regarding prospective jurors' exposure or relationship to children where the prospective juror in each instance either answered the question before the objection was made or had answered a similar question previously, or an objection was to form and defense counsel was allowed to restate the question.

**Am Jur 2d, Jury §§ 205, 206.**

10. **Evidence and Witnesses § 125 (NCI4th)— rape and murder of child—prior third-party sexual behavior with child—not admissible**

The trial court did not err in a prosecution for the first-degree rape and first-degree murder of a four-year-old child by her mother's fiancee by not admitting evidence of prior sexual activity with her father where all of the evidence indicated that the injuries to the child's vagina were recent in relation to the time of her death.

**Am Jur 2d, Homicide §§ 245, 270; Rape § 55.**

11. **Evidence and Witnesses § 1694 (NCI4th)— capital murder—victim's body—photographs**

The trial court did not err in a prosecution for the first-degree murder and first-degree rape of a four-year-old girl by admitting a number of crime scene and autopsy photographs of the black plastic bag in which the body was found, the position of the body

and clothes after the bag was opened, pictures of various blood-stains around the house, and autopsy photographs illustrating the injuries. The photographs were neither repetitious nor prejudicial, all were used to illustrate testimony, and the number was not excessive.

**Am Jur 2d, Homicide § 416.**

**12. Evidence and Witnesses § 1731 (NCI4th)— capital murder and rape—videotape of body**

The trial court did not abuse its discretion in a prosecution for the first-degree rape and murder of a four-year-old girl by admitting a twenty-minute videotape which portrayed the discovery of the body, including ninety seconds that focused on the bloodied head and body. The videotape was a fair and accurate representation of the gruesome scene officers encountered at defendant's home, the tape was tendered with a limiting instruction, and the fact that it took so long to uncover the body is strong circumstantial evidence of premeditation and deliberation, malice, and intent to kill.

**Am Jur 2d, Evidence § 979; Trial § 508.**

**Admissibility of videotape film in evidence in criminal trial. 60 ALR3d 333.**

**13. Evidence and Witnesses § 2054 (NCI4th)— capital murder—testimony of officer—red dots paint rather than blood**

The trial court in a prosecution for first-degree murder and first-degree rape properly allowed an officer to testify that red spots in defendant's truck were red oxide primer rather than blood, which contradicted defendant's statement. Based on the officer's experience with a part-time job doing car repair and body shop work, it is likely that he could perceive the difference between blood and red oxide primer.

**Am Jur 2d, Expert and Opinion Evidence § 300.**

**14. Evidence and Witnesses § 2209 (NCI4th)— capital murder—bloodstains—expert testimony**

There was no error in a first-degree murder prosecution where the trial court admitted the testimony of a forensic serology expert that blood found in defendant's laundry room was consistent with the victim's where the witness identified the blood

type as Hemoglobin Type 1 and the blood in the laundry room as Hemoglobin Type A. Although defendant argues that this difference in blood types means that the opinion with respect to consistency between blood types was contrary to the facts, the reference to Hemoglobin Type 1 was no more than a *lapsus linguae*. There is no such thing as Hemoglobin Type 1 blood, the witness testified that the blood from the laundry room was consistent with hemoglobin from defendant and the victim, and then correctly testified that defendant's hemoglobin was Type A.

**Am Jur 2d, Expert and Opinion Evidence § 300.**

**15. Evidence and Witnesses § 1339 (NCI4th)— capital murder—interrogation of defendant—scenario suggested by officer**

The trial court did not abuse its discretion in a prosecution for first-degree murder and first-degree rape where the State wished to call an FBI agent to testify regarding a scenario he had presented to defendant as an interviewing technique in order to elicit a response from defendant and which the State wished to use to show that defendant's explanation about accidentally hitting the victim with his truck originated with the agent; defense counsel argued that the scenario was derived from oral statements made by defendant to the agent which had been disclosed pursuant to the court's discovery order; the agent first testified at a hearing that he thought he may have acquired the information from defendant; the court held that the evidence must be excluded; the State was allowed to recall the agent, who testified that the information was obtained from police officers, not from defendant; and the trial court ruled that the discovery order had not been violated and that the testimony was admissible. Because there is competent evidence in the record to support the trial court's finding that the agent knew defendant drove a truck prior to talking with defendant, it cannot be concluded that the trial court abused its discretion.

**Am Jur 2d, Evidence § 714.**

**16. Criminal Law § 445 (NCI4th)— capital murder and first-degree rape—prosecutor's argument—factually based—not an expression of personal opinion**

There was no error in a prosecution for the first-degree murder and first-degree rape of a four-year-old girl in the prosecutor's

argument regarding what the mother of the victim said where there was no explicit testimony that the mother asked that question, but the argument in context was factually based, emphasized the fallacy of defendant's explanation, and was not an expression of personal opinion.

**Am Jur 2d, Trial §§ 554, 632.**

### 17. Criminal Law § 461 (NCI4th)— capital murder and rape— prosecutor's argument—matters inferred from evidence

There was no error in the prosecution of defendant for the first-degree murder and first-degree rape of a four-year-old child in the prosecutor's argument that defendant held the victim down and forcibly raped her while she cried and moaned. Although defendant contended that the prosecutor's argument amounted to impermissible speculation as to facts not in evidence, it would be reasonable, if not likely, for the jury to infer from the evidence that defendant physically restrained the victim while he forced himself upon her and that the victim cried out in fear and pain during the ordeal.

**Am Jur 2d, Trial §§ 609, 632.**

### 18. Criminal Law § 461 (NCI4th)— capital murder and rape— prosecutor's argument—matters inferred from evidence

There was no error in the prosecution of defendant for the first-degree murder and first-degree rape of a four-year-old child in the prosecutor's argument that he spoke for the victim, who died to fulfill the sick desires of the defendant. The evidence is sufficiently clear that defendant sexually assaulted the victim and that the killing followed as a part of the same violent transaction; it was not too speculative for the jury to infer that defendant committed these acts against a four-year-old girl with an intent to satisfy his perverse desires.

**Am Jur 2d, Trial §§ 632, 664.**

### 19. Criminal Law § 461 (NCI4th)— capital murder and rape— prosecutor's argument—matters inferred from evidence

There was no error in the prosecution of defendant for the first-degree murder and first-degree rape of a four-year-old child in the prosecutor's argument that a doctor had testified that the victim was raped. The statutory definition of rape includes vaginal intercourse with a victim who is a child under the age of thirteen and where the defendant is at least twelve years old and is at

least four years older than the victim; or with another person by force and against the will of the other person, inflicting serious personal injury. The doctor testified that the victim's injuries were "most indicative of forced intercourse"; under either definition, the prosecutor's characterization of the testimony and the actual testimony are entirely consistent. Further, the trial court repeatedly cautioned the jurors that final arguments are not evidence and instructed that they were to be guided by their own recollection of the evidence.

**Am Jur 2d, Trial §§ 632, 640.**

**20. Constitutional Law § 370 (NCI4th); Criminal Law § 1343 (NCI4th)— capital murder—aggravating circumstance— especially heinous, atrocious, or cruel—not unconstitutionally vague**

The especially heinous, atrocious, or cruel aggravating circumstance in capital cases is not unconstitutionally vague.

**Am Jur 2d, Trial § 841.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

**21. Criminal Law § 1345 (NCI4th)— capital murder—aggravating circumstances—especially heinous, atrocious, or cruel—evidence independent of rape sufficient**

The jury was properly permitted to find in a first-degree murder sentencing hearing both that the murder of the four-year-old victim was committed while defendant engaged in the commission of first-degree rape and that the murder was especially heinous, atrocious, or cruel where, taken as a whole, the evidence of the victim's physical and psychological suffering and of the brutal, dehumanizing nature of the killing was sufficient to support the submission of this aggravating circumstance; while the evidence of rape contributed to this unique combination of factors, ample independent evidence existed to justify submission.

**Am Jur 2d, Trial §§ 841, 1760.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

22. **Criminal Law § 1320 (NCI4th)— capital murder—sentencing—instructions—consideration of same evidence for more than one circumstance**

There was no plain error in a first-degree murder prosecution where defendant contended that the court erred by not instructing the jury that it could not consider the same evidence to find more than one aggravating circumstance, but, in light of the holding elsewhere that there was independent evidence supporting each aggravating circumstance, defendant did not show that any error in the instructions likely affected the outcome.

**Am Jur 2d, Trial § 1760.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

23. **Criminal Law §§ 448, 451 (NCI4th)— capital murder—sentencing hearing—prosecutor's argument—victim's age—victim's thoughts**

There was no prejudicial error in the prosecutor's argument in the sentencing hearing for the first-degree murder of a four-year-old girl where defendant contended that the prosecutor argued matters not supported by the evidence and improperly expressed his personal beliefs. The objectives of the arguments in the guilt and sentencing phases are different and rhetoric that may be prejudicially improper in the guilt phase is acceptable in the sentencing phase. Given the overwhelming evidence against defendant, the prosecutor's argument regarding what the victim was thinking and feeling while defendant beat and raped her was not prejudicial error, if error at all, and the prosecutor's references to the victim's age merely emphasized the brutality of the crime as well as the depravity of defendant's acts. Nothing in the record suggests that the jury made its recommendations based upon passion or prejudice or that it acted arbitrarily.

**Am Jur 2d, Trial §§ 648, 664, 666, 1759.**

**Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.**

**24. Criminal Law § 1329 (NCI4th)—capital murder—sentencing—Issues Three and Four**

The trial court did not err in a first-degree murder sentencing hearing by making found mitigating circumstances discretionary when the jury considered issues Three and Four.

**Am Jur 2d, Trial § 1760.**

**25. Criminal Law § 856 (NCI4th)— capital murder and first-degree rape—instruction that sentence of life would be give for rape—denied**

The trial court did not err in a prosecution for first-degree murder and first-degree rape by denying defendant's request to instruct the jury that defendant would be sentenced to life in prison for his conviction of first-degree rape.

**Am Jur 2d, Trial §§ 1441, 1443.**

**26. Jury § 141 (NCI4th)— capital murder and rape—questioning of jurors—parole eligibility**

The trial court did not err in a prosecution for first-degree rape and first-degree murder by denying defendant's request to question jurors regarding their beliefs about parole eligibility.

**Am Jur 2d, Jury §§ 264, 269.**

**27. Criminal Law § 1373 (NCI4th)— capital murder—death sentence—not disproportionate**

A sentence of death for first-degree murder was not disproportionate in a case which has several distinguishing characteristics: defendant was found guilty of first-degree murder based on both the felony murder rule and on premeditation and deliberation; the jury found the murder to be especially heinous, atrocious, or cruel; the victim was a four-year-old girl who knew and trusted defendant; the murder occurred during the commission of a sexual assault; the victim suffered great physical pain in that she was brutally beaten, strangled, and raped; and defendant concealed the body and then purposefully misled police for several days regarding its location.

**Am Jur 2d, Criminal Law § 628.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

STATE v. KANDIES

[342 N.C. 419 (1996)]

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by McHugh, J., at the 4 April 1994 Criminal Session of Superior Court, Randolph County, on a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional judgment for first-degree rape was allowed 12 May 1995. Heard in the Supreme Court 13 November 1995.

*Michael F. Easley, Attorney General, by William B. Crumpler, Assistant Attorney General, for the State.*

*J. Kirk Osborn for defendant-appellant.*

WHICHARD, Justice.

Defendant was tried capitally for the first-degree murder and first-degree rape of Natalie Lynn Osborne, the four-year-old daughter of defendant's fiancée. The jury found defendant guilty on both charges and recommended a sentence of death for the first-degree murder. The trial court sentenced accordingly on the murder charge and sentenced defendant to life imprisonment for the rape, to begin at the expiration of the murder sentence. We hold that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error, and that the sentence of death is not disproportionate.

Patricia Craven lived in Asheboro with her four-year-old daughter, Natalie, and her sons, Zachary and Jeremy, ages six and one, respectively. Defendant was Craven's fiancé and Jeremy's father. Although defendant had a separate residence approximately ten miles away in Randleman, he often stayed with Craven at her apartment in Asheboro.

On Easter Monday, 20 April 1992, defendant and Craven disciplined Natalie for eating Zachary's Easter candy by requiring her to stay in her room for the remainder of the day. Craven saw Natalie periodically throughout the day, but last saw her alive between 4:00 and 4:30 p.m. Around 4:45 p.m., defendant left the apartment to go to the grocery store. He did not return until 7:30 that evening. He attributed his tardiness to helping an elderly couple who had mechanical problems with their Winnebago. Once home, defendant began fixing a pizza for the children. When it was ready, he told Zachary to call for Natalie. When Zachary did not find Natalie in her bedroom, defendant and Craven began looking for her. One neighbor told Craven that he had noticed Natalie outside playing sometime that afternoon, but no

one recalled seeing her since that time. After a while, defendant called the Asheboro Police Department to report Natalie missing. An extensive search for her was conducted that night, but without success.

Earlier that evening, around 7:00 p.m., defendant entered the Tank and Tummy, a small convenience store located about one-half mile from the Craven residence. Carolyn Wood, the clerk, testified that at that time, defendant was complaining about his hand hurting. He told Wood that he had gotten into a fight with his brother. Wood noticed that the hand was beginning to swell and suggested that defendant let a medical technician who happened to be in the store look at his hand to see if it was broken. Defendant declined and immediately left the store.

Later that evening, close to midnight, defendant returned to the store to ask if Wood had seen Natalie. He showed Wood a picture of Natalie and told her to call the police if she saw the little girl. At the time, Wood observed black garbage bags in the back of defendant's truck.

On Tuesday, 21 April 1992, defendant agreed to accompany officers to his residence in Randleman to look for Natalie. The police surmised that perhaps Craven and defendant had hidden Natalie at the Randleman residence because Craven had been in a custody dispute over Natalie with her former husband, Ed Osborne. The police looked through the house but did not find Natalie.

On Wednesday, 22 April, Craven and defendant went to the Asheboro Police Department for questioning. Craven was questioned and released around 7:30 p.m., while defendant remained at the station for further interrogation. Defendant was finally taken home by Sergeant Rickey Wilson about 1:00 a.m. Upon defendant's return to the apartment, Craven asked him if he knew anything about what happened to Natalie. Defendant responded by telling Craven that he had hit Natalie with his truck when he was leaving to go to the grocery store on Easter Monday. Natalie was outside rather than in her room, and defendant did not see her in time to stop. Defendant said he panicked because he had been drinking. He picked Natalie up and took her to the house in Randleman to clean her and see how badly she was hurt. During the drive to Randleman, defendant said that Natalie was making gurgling noises and that her head did not look right. After trying to clean her, defendant concealed Natalie and her clothes in

a garbage bag and put the bag in a bedroom closet. Defendant then got in his truck and took his time returning to Asheboro.

Craven called the police immediately upon hearing defendant's story. Defendant was taken to the Asheboro Police Department, where Sergeant Wilson read him his *Miranda* rights and then interviewed him. Defendant told Sergeant Wilson what he had told Craven. Shortly after giving a statement to Sergeant Wilson, defendant gave a statement to Lieutenant Lanny McIver. This statement was more detailed but in substance was the same as that given to Sergeant Wilson. Defendant gave details as to the location of Natalie's body and signed consent to search forms for the Randleman house.

The police searched the Randleman residence and found Natalie's body in a plastic bag, buried under a pile of clothes and carpet pieces in a bedroom closet. A bloody playsuit and a bloody pair of panties, both turned inside out, were also found in the bag. The process of recovering the body was videotaped, and photographs of the crime scene were taken.

Dr. Thomas Clark, a forensic pathologist, performed an autopsy on the body shortly after it was recovered. He found two lacerations to the top of the head which he characterized as blunt-force injuries. He also found lacerations on the right side of the head and abrasions on the left side of the head and on the front of the neck; there was evidence the skull had been fractured. There were multiple bruises on the back and both sides; the bruises were small and rounded and had a distribution and shape suggestive of an adult hand. Clark also found injuries to the pelvic region. There were bruises on both sides of the vagina, which was full of blood. The opening of the vagina was patulous, and there was a laceration a half-inch wide and an inch long on the back wall of the vagina. Clark opined that these injuries were indicative of sexual assault and that they had occurred at or about the time of death.

That evening, after the results of the autopsy had been revealed, Lieutenant McIver again interrogated defendant. When McIver mentioned the possibility of sexual assault, defendant stated, "I told Pat you were going to say I did something like that to Natalie." Thereafter, in his statement, defendant denied doing anything sexual to Natalie. He remembered taking Natalie to his house, putting her in the bathtub, and taking off her clothes to see how badly she was hurt. At that time Natalie was bleeding extensively but appeared to be alive

and moving. Defendant stated that he could not handle the situation and may have strangled Natalie.

A rape suspect collection kit test was completed on defendant. The kit included samples of head and pubic hair, saliva, and blood, and was submitted to the SBI crime lab for examination. Agent Lucy Milks, an SBI forensic serologist, performed a luminal and blood test on the Randleman residence and on defendant's truck. At the Randleman residence, she found the presence of blood on the bathroom floor and tub; the bedroom floor; the laundry room floor; the kitchen floor; and the floor between the bedroom, bathroom, and den. She also found a small amount of blood on the interior of the passenger door of defendant's truck.

Defendant presented no evidence during the guilt-innocence phase. During the sentencing phase, defendant presented evidence through Dr. Brian Glover, a clinical psychologist, who testified as an expert in substance abuse treatment. Glover testified that by age seventeen, defendant was using alcohol and marijuana on a daily basis and that for the several years preceding this offense, defendant was drinking between twelve and twenty-four beers per day. It was Glover's opinion that defendant had severe alcohol dependence and that on the day of the offense, defendant was suffering from acute intoxication which affected his judgment and ability to control his emotions. Glover also opined that on 20 April 1992, defendant was under a mental disorder and that his ability to appreciate the criminality of his actions was impaired.

The jury found defendant guilty of first-degree murder based on both the felony murder rule and on premeditation and deliberation. It also found him guilty of first-degree rape. At the capital sentencing proceeding, the jury found as aggravating circumstances that the murder was committed while defendant was engaged in the commission of first-degree rape and that the murder was especially heinous, atrocious, or cruel. The jury found three of the five proposed statutory mitigating circumstances and eighteen of the twenty-eight nonstatutory mitigating circumstances submitted. It unanimously recommended a sentence of death, which the trial court accordingly imposed.

JURY SELECTION ISSUES

[1] Defendant first argues that the prosecutor violated his state and federal constitutional rights by peremptorily challenging prospective

jurors solely on the basis of their race. Article I, Section 26 of the Constitution of North Carolina prohibits such use of peremptory challenges. *State v. Glenn,* 333 N.C. 296, 301, 425 S.E.2d 688, 692 (1993). The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution also prohibits such discrimination. *Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69 (1986).

In *Batson* the United State Supreme Court set out a three-pronged process to determine whether a prosecutor impermissibly excluded prospective jurors because of their race. First, a criminal defendant must make out a prima facie case of discrimination by demonstrating that the prosecutor exercised peremptory challenges on the basis of race and that this fact and other relevant circumstances raise an inference of discrimination. *Id.* at 96, 90 L. Ed. 2d at 87-88, *as modified by Powers v. Ohio,* 499 U.S. 400, 113 L. Ed. 2d 411 (1991). Here the prosecutor voluntarily gave reasons for the dismissal of each juror in question. Accordingly, we need not address the question of whether defendant met his initial burden of showing discrimination and may proceed as if a prima facie case had been established. *State v. Robinson,* 330 N.C. 1, 17, 409 S.E.2d 288, 297 (1991).

Second, the State must "articulate legitimate reasons which are clear and reasonably specific and related to the particular case to be tried which give a neutral explanation for challenging jurors of the cognizable group." *State v. Jackson,* 322 N.C. 251, 254, 368 S.E.2d 838, 840 (1988), *cert. denied,* 490 U.S. 1110, 104 L. Ed. 2d 1027 (1989). These reasons " 'need not rise to the level justifying exercise of a challenge for cause.' " *State v. Porter,* 326 N.C. 489, 498, 391 S.E.2d 144, 151 (1990) (quoting *Batson,* 476 U.S. at 97, 90 L. Ed. 2d at 88). "So long as the motive does not appear to be racial discrimination, the prosecutor may exercise peremptory challenges on the basis of 'legitimate "hunches" and past experience.' " *Id.* (quoting *State v. Antwine,* 743 S.W.2d 51, 65 (Mo. 1987) (en banc), *cert. denied,* 486 U.S. 1017, 100 L. Ed. 2d 217 (1988)).

Finally, the trial court must "determine whether the defendant has carried his burden of proving purposeful discrimination." *Hernandez v. New York,* 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991). In evaluating the State's explanations, a reviewing court should remember that the trial court's findings "largely will turn on evaluation of credibility, [and so] should give those findings great deference." *Batson,* 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21. The findings of a trial court are not to be overturned unless the appellate

court is "convinced that its determination was clearly erroneous." *Hernandez*, 500 U.S. at 365, 114 L. Ed. 2d at 412.

Factors to which this Court has looked to determine the presence or absence of intentional discrimination include (1) " 'the susceptibility of the particular case to racial discrimination,' " *Porter*, 326 N.C. at 498, 391 S.E.2d at 150 (quoting *State v. Antwine*, 743 S.W.2d at 65); (2) whether the State used all of its peremptory challenges, *Jackson*, 322 N.C. at 255, 368 S.E.2d at 840; (3) the race of witnesses in the case, *id.*; (4) questions and statements by the prosecutor during jury selection which tend to support or refute an inference of discrimination, *State v. Smith*, 328 N.C. 99, 121, 400 S.E.2d 712, 724-25 (1991); (5) whether the State accepted any black jurors, *id.*; and (6) whether similarly situated whites were accepted as jurors, *Robinson*, 330 N.C. at 19, 409 S.E.2d at 298. Additionally, "[a]n examination of the actual explanations given by the district attorney for challenging black veniremen is a crucial part of testing defendant's *Batson* claim." *Smith*, 328 N.C. at 125, 400 S.E.2d at 726.

**[2]** In this case the defendant is white, the victim was white, and several witnesses are white. The prosecutor accepted three black jurors when he had peremptory challenges remaining.

With these general facts and guidelines in mind, we turn to the State's reasons for peremptorily challenging each of the nine black prospective jurors. Defendant raised his first *Batson* challenge when the prosecutor struck potential jurors Randleman, Jinwright, and Massey. As the basis for his exercise of the peremptory challenges, the prosecutor stated that (1) Randleman was hesitant on the death penalty, and although her juror questionnaire indicated no convictions, her record indicates that she had been convicted of worthless checks and two speeding violations; (2) Jinwright worked with three- and four-year-old children and was hesitant on the death penalty question; and (3) Massey was hard of hearing and had difficulty understanding questions. Defendant made no further showing at trial regarding these jurors. He now argues that the prosecutor passed several similarly situated white jurors and that this disparate treatment of black and white jurors reveals a pretextual explanation for excluding blacks from the jury.

Defendant's approach "involves finding a single factor among the several articulated by the prosecutor . . . and matching it to a passed juror who exhibited that same factor." *Porter*, 326 N.C. at 501, 391 S.E.2d at 152. We have rejected this approach and do so again

because it "fails to address the factors as a totality which when considered together provide an image of a juror considered . . . undesirable by the State." *Id.* We conclude that the trial court did not err in overruling defendant's objection to the State's use of its peremptory challenges for these jurors.

[3] In his second *Batson* objection, defendant questioned the State's dismissal of prospective jurors Rawlinson and McClure. As his reason for these dismissals, the prosecutor stated that a source within the High Point Police Department indicated that Rawlinson and McClure would not be good jurors for this case because they were weak on the death penalty. Further, a court officer noticed McClure nodding off at least twice during *voir dire.*

After the prosecutor volunteered these explanations, the trial court noted that the prosecutor passed a minority juror called as a replacement. The trial court then held that the reasons enunciated by the prosecutor were valid bases and not solely motivated by impermissible racial discrimination. We hold that the trial court did not err in overruling defendant's objection to the State's excusal of these prospective jurors.

[4] Defendant's subsequent *Batson* challenges arose when the State excused prospective jurors Campbell, Hines, and Wilson. The prosecutor voluntarily responded to each challenge. He stated that he excused Campbell because he stated that he did not believe in the death penalty. Moreover, a record check indicated that a person named Fred Campbell had a prior common law robbery conviction. Hines was dismissed because he was worried about his employment and loss of income; he had never thought about the death penalty; and although Hines denied it, the State's records indicated that he had prior convictions for driving while impaired and driving while license revoked. The prosecutor excused Wilson because it appeared that he had a record of reckless driving, driving while impaired, four worthless checks, two injury to personal property convictions, a simple assault, and assault by pointing a gun. A juror's criminal history is a sufficiently neutral reason to challenge that juror. *See Porter*, 326 N.C. at 499, 391 S.E.2d at 151. We find no error in the trial court's dismissal of prospective jurors Campbell, Hines, and Wilson.

[5] Defendant raised his final *Batson* challenge when the State excused prospective alternate juror Oliver. The prosecutor voluntarily explained that Oliver appeared to have trouble hearing, as evidenced by her failure to heed the court's instruction about not watch-

ing television and not listening to any radio broadcasts concerning this case. The prosecutor was concerned that she would have difficulty hearing and understanding as the trial proceeded. In overruling defendant's objection, the trial court noted Oliver's inability to hear the prosecutor's questions without requesting clarification on numerous occasions during *voir dire*. We hold that the trial court properly overruled defendant's objection to the State's excusal of this prospective juror.

Taken singly or in combination, the State's dismissal of each of these jurors was based on race-neutral reasons which were clearly supported by their individual responses during *voir dire*. The trial court correctly ruled that the State did not exclude any jurors based solely upon their race in violation of *Batson* or the Constitution of North Carolina. Defendant's assignments of error on these grounds are overruled.

**[6]** In his next assignment of error, defendant contends that the trial court erred in denying his motion to require the State to produce copies of criminal records of prospective jurors. Defendant moved pretrial for copies of all the criminal record checks for prospective jurors obtained by the prosecution. The trial court denied this motion. Defendant subsequently renewed the motion three times during jury selection when the prosecutor asserted that the reason he was challenging a prospective black juror was because the juror failed to disclose a prior criminal record either on his questionnaire or during *voir dire*. Defendant argues that the trial court's acceptance at face value of the prosecutor's reason for discharging a black juror because of an undisclosed criminal record violates defendant's due process rights as well as his right to a fair and impartial jury. We disagree.

It is well settled in North Carolina that "the trial judge has broad discretion to see that a competent, fair and impartial jury is impaneled and rulings of the trial judge in this regard will not be reversed absent a showing of abuse of discretion." *State v. Johnson*, 298 N.C. 355, 362, 259 S.E.2d 752, 757 (1979). Defendant has failed to show an abuse of discretion here. First, there is no statutory requirement that a prosecutor must reveal juror information in his possession. Section 15A-903 of the North Carolina General Statutes describes types of information obtained by the State that may be subject to disclosure. No mention is made of criminal records of prospective jurors. N.C.G.S. § 15A-904 pertains to information not subject to disclosure;

it provides in pertinent part that except as otherwise required by N.C.G.S. § 15A-903, production of reports, memoranda, or other internal documents made by the State or persons acting in its behalf in connection with the prosecution of the case is not required. Where a statute expressly restricts discovery, as does N.C.G.S. § 15A-904(a), the trial court has no authority to order discovery. *State v. Hardy*, 293 N.C. 105, 125, 235 S.E.2d 828, 840 (1977).

Further, the district attorney is an officer of the court and, as such, is sworn to represent the State honestly and to the best of his ability. Absent evidence to the contrary, it is not unreasonable for the trial court to assume that the prosecutor is telling the truth with regard to the criminal records of prospective jurors.

Finally, once the prosecutor has articulated a nonracial explanation for each challenged peremptory strike, the burden shifts to the defendant to introduce evidence that the State's reasons are a pretext. *Robinson*, 330 N.C. at 16, 409 S.E.2d at 296. Thus, the ultimate burden of rebutting the State's representations and proving purposeful discrimination lies with the defendant. Defendant had sufficient opportunity to produce evidence that the prospective jurors in question did not have criminal records. He could have obtained a record check himself or secured a court order requiring production of these documents. There were resources available to defendant to rebut the State's explanations, and he chose not to utilize them.

Absent authority mandating that the trial court allow defendant to discover these documents and absent any evidence produced by defendant questioning the validity of the prosecutor's representations, it cannot be said that the trial court abused its discretion in denying defendant's motion. This assignment of error is overruled.

[7] Defendant next contends that the trial court erred in failing to excuse juror Mayberry for cause because his views regarding first-degree murder would prevent him from considering life imprisonment as an appropriate punishment. The standard for determining whether a prospective juror may properly be excused for cause for his views on capital punishment is whether those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985). Our reading of the transcript reveals that defendant did not establish that Mayberry's views on capital punishment would substantially impair the perform-

ance of his duties as a juror; therefore, the trial court properly denied defendant's challenge.

Defendant initially challenged Mayberry for cause based upon his response that life imprisonment for someone convicted of first-degree murder was "not fair to the general public." Without ruling on the challenge, the trial court allowed the prosecutor to question Mayberry. After several perplexing answers to the prosecutor's questions, the trial court spoke with Mayberry. The trial court's *voir dire* proceeded in pertinent part as follows:

> THE COURT: All right. So a juror must be able to consider both penalties at that sentencing hearing and must be able to weigh whether the State has carried its burden of proof on each of the three issues. So a juror who would automatically vote to impose the death penalty on any first degree murder case would not be carrying out his duty to consider the three additional issues that any juror must consider under our law. So the question becomes whether you can follow the law and require the State to prove those three things beyond a reasonable doubt if we reach a sentencing hearing and whether you can consider the imposition of a sentence of life imprisonment if you, as part of that sentencing jury, finds [sic] that the State has not carried its burden of proof on those three issues.

> MR. MAYBERRY: Okay. I follow what you're saying.

> THE COURT: Okay. Now, we'll go back. Do you believe, searching your own conscience, that you would be able to consider both possible penalties and require the State to prove the things the law says must be proved before the jury can consider the death penalty, if we reach that stage?

> MR. MAYBERRY: Understanding the law now, I guess I would have to.

> THE COURT: Would you be able to abide by the Court's instructions and apply that procedure in determining the appropriate punishment?

> MR. MAYBERRY: Yeah, I guess I would have to.

> THE COURT: And you are—Is it correct for me to say then that you would not automatically vote for the death penalty in the event this Defendant is found guilty by the jury of first degree murder?

MR. MAYBERRY: Provided the second phase has been followed.

THE COURT: If you were part of the jury that returned a verdict of first degree murder would you be willing to require the State to prove those additional three issues before you would consider recommending the death penalty?

MR. MAYBERRY: That's the way the system works, isn't it? I would.

THE COURT: Would you be willing to follow the law as the Court explains it to you?

MR. MAYBERRY: Yes.

Thereafter, defense counsel was permitted to question Mayberry further, whereupon Mayberry restated that he would consider the law as instructed by the trial court.

Because Mayberry said he could put aside his prejudice concerning the death penalty and could follow the law as instructed, he was properly not excused for cause under the *Witt* standard. *See State v. Quesinberry*, 319 N.C. 228, 235, 354 S.E.2d 446, 450-51 (1987). We conclude the trial court did not err in refusing to remove Mayberry upon defendant's challenge for cause.

[8] In a related assignment of error, defendant argues that the trial court improperly limited his *voir dire* of jurors Mayberry and Peterson. On several occasions the trial court sustained objections to questions pertaining to these jurors' views on capital punishment. Examples include:

What feelings or what life experiences do you bring into the courtroom that would make you feel [very strongly for the death penalty]?

Do you think the defendant should prove to you why he should be given life imprisonment rather than the death penalty if he's convicted of first degree murder?

Would the age of the victim in this case, any particular first degree murder, make a difference to you as to whether you would impose a life sentence or a death sentence?

Do you have any difficulty in imposing a life sentence on someone you just convicted of first degree murder?

Do you feel that it would be difficult for you to consider any other punishment other than death if you were entirely convinced and fully satisfied that someone had committed first degree murder?

Would it be hard or difficult or substantially impair your ability to consider that [the State] had to prove more [aggravating circumstances as well as defendant's guilt] to you?

Defendant argues that he must be permitted the opportunity "to lay bare the foundation of [his] challenge for cause against those prospective jurors who would *always* impose death following conviction." *Morgan v. Illinois,* 504 U.S. 719, 733, 119 L. Ed. 2d 492, 506 (1992). To this end, he contends that these questions were proper under *Morgan* because they inquired into whether a juror could be fair and impartial and whether predetermined views regarding the death penalty would substantially impair that prospective juror's ability to serve. We conclude that *Morgan* does not require that a defendant be allowed to ask the questions at issue.

In *State v. Robinson,* 339 N.C. 263, 273, 451 S.E.2d 196, 202 (1994), *cert. denied,* —— U.S. ——, 132 L. Ed. 2d 818 (1995), this Court held that it was improper to ask potential jurors if they would impose the death penalty under the particular facts and circumstances of the case. In *Robinson* the defendant attempted to ask prospective jurors if they would be able to follow the trial court's instructions and weigh the aggravating and mitigating circumstances even though the defendant had killed three people, including a child, and had a previous conviction for first-degree murder. *Id.* at 272, 451 S.E.2d at 202. This Court held that the trial court did not err by disallowing the question because the question was "an improper attempt to 'stake out' the jurors as to their answers to legal questions before they are informed of legal principles applicable to their sentencing recommendation." *Id.* at 273, 451 S.E.2d at 202. This Court further noted that " '[c]ounsel should not fish for answers to legal questions before the judge has instructed the juror on applicable legal principles by which the juror should be guided . . . . Jurors should not be asked what kind of verdict they would render under certain named circumstances.' " *Id.* (quoting *State v. Phillips,* 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980)). We conclude that the questions at issue here were an improper attempt to "stake out" the jurors and determine what kind of verdict the jurors would render under a given set of circumstances.

[9] Under this same assignment of error, defendant also contends the trial court erred by repeatedly sustaining the prosecutor's objections

STATE v. KANDIES

[342 N.C. 419 (1996)]

to defense questions regarding the prospective juror's exposure or relationship to children. In each instance defendant complains of, the prospective juror either answered the question before the objection was made; or had answered a similar question previously; or an objection was made as to form, and defense counsel was allowed to restate the question. Thus, defendant has failed to show an abuse of discretion by the trial court.

### Guilt-Innocence Phase

[10] Defendant's next assignment of error concerns the admissibility of evidence regarding prior instances of sexual behavior of Natalie. Defendant filed a written motion pursuant to N.C.G.S. § 8C-1, Rule 412(b)(2) offering proof that Natalie had testified in a juvenile hearing on 30 January 1992 that her father had "kissed her pee-pee." After an *in camera* hearing, the trial court denied defendant's motion. Defendant contends that he should have been allowed to present this evidence because it supported his argument that Natalie had been involved in prior sexual behavior and that defendant, having run over Natalie with his truck, only aggravated preexisting injuries to her vagina. We conclude that defendant's proffered evidence was too temporally remote to be relevant to this offense and that the trial court properly denied defendant's motion.

All of the evidence indicates that the injuries to Natalie's vagina were recent in relation to the time of her death. Dr. Clark testified that he performed an internal examination of Natalie and found serious injuries to the pelvic region. Natalie's vagina was full of blood, and there was a laceration on the back wall of the vagina. The laceration was a blunt-force injury and was indicative of forced intercourse. Clark opined that the injuries occurred at or about the time of death based on the amount of blood that was in the vagina and the lack of healing. Clark also testified that the opening of the vagina was patulous, which means it was gaping open. This is a condition not normally seen in the body of a young child, even in a state of decomposition. Finally, Clark stated that the vaginal injuries were so significant that they would have caused bleeding visible to an average person. Yet, Craven, Natalie's mother, had never noticed any bleeding or vaginal problems prior to the date of this offense.

In view of the uncontroverted evidence indicating that Natalie's vaginal injuries occurred near the time of her death, we find defendant's argument to be without merit. This assignment of error is accordingly overruled.

[11] Defendant next argues that the trial court erred by admitting into evidence a number of crime-scene and autopsy photographs as well as a videotape of the crime scene. Specifically, defendant objects to crime-scene photographs of the black plastic bag and of the position of the body and clothes after the bag was opened; pictures of various bloodstains around the house; autopsy photographs illustrating Natalie's injuries; and a videotape that contained a ninety-second close-up of the body after recovery. The trial court admitted all of these exhibits for illustrative purposes.

Defendant contends that these exhibits should have been excluded because they were repetitious and their probative value was outweighed by the danger of unfair prejudice. *See* N.C.G.S. § 8C-1, Rule 403 (1992). What represents "an excessive number of photographs" and whether the "photographic evidence is more probative than prejudicial" are matters within the trial court's sound discretion. *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). Photographs "showing the condition of the body when found, its location when found, and the surrounding scene at the time . . . are not rendered incompetent by the portrayal of the gruesome events which the witness testifies they accurately portray." *State v. Elkerson*, 304 N.C. 658, 665, 285 S.E.2d 784, 789 (1982). Repetitive photographs may be introduced, even if they are revolting, as long as they are used for illustrative purposes and are not offered solely to arouse prejudice or passion in the jury. *Hennis*, 323 N.C. at 284, 372 S.E.2d at 526. Factors a court may consider include what the photographs depict, the level of detail, the manner of presentation, and the scope of accompanying testimony. *Id.* at 285, 372 S.E.2d at 527.

The photographs about which defendant complains were neither repetitious nor prejudicial. All were used to illustrate the testimony of witnesses. The photographs of the crime scene were introduced during the testimony of Sergeant Wilson and illustrated his testimony "with respect to the crime scene in general" and "the location and position of the body when found." *State v. Smith*, 320 N.C. 404, 416, 358 S.E.2d 329, 336 (1987). The autopsy photographs used by Dr. Clark showed various angles of the lacerations to the head as well as the injuries to the vaginal area and properly illustrated the nature of the wounds and the manner of killing. The number of photographs was not excessive, and in fact, the trial court excluded several pictures because they were repetitive. Defendant has failed to show an abuse of discretion in the admission of the crime-scene and autopsy photographs.

**[12]** Defendant also contests the admission of a twenty-minute video-tape which portrayed the discovery of the body and contained ninety seconds of footage that focused on the bloodied head and body of Natalie. The basic principles which govern the admissibility of pho-tographs apply to videotapes, *State v. Strickland,* 276 N.C. 253, 258, 173 S.E.2d 129, 132 (1970), and relevant videotapes of crime scenes are admissible when they are not inflammatory or so unduly prejudi-cial as to outweigh any probative value, *cf. State v. Leazer,* 337 N.C. 454, 456-57, 446 S.E.2d 54, 55-56 (1994) (admission of videotape of crime scene, including removal of victim, upheld).

Here the videotape was introduced during the testimony of Sergeant Wilson and was a fair and accurate representation of the gruesome scene officers encountered at defendant's home. The tape was tendered with a limiting instruction that it was being admitted for the purpose of illustrating the testimony of the witness and was not to be considered for any other purpose. Such a cautionary instruction limits the likelihood of unfair prejudice. *State v. Thompson,* 328 N.C. 477, 492, 402 S.E.2d 386, 394 (1991). Further, photographic evidence, including videotapes, may "be introduced in a murder trial to illus-trate testimony regarding the manner of killing so as to prove cir-cumstantially the elements of murder in the first degree." *Hennis,* 323 N.C. at 284, 372 S.E.2d at 526. This videotape was more than twenty minutes long, not including an eighteen-minute gap, the majority of which portrayed the discovery and removal of Natalie's body from the bedroom closet. The fact that it took so long to uncover the body is strong circumstantial evidence of premeditation and deliberation, malice, and intent to kill. We find no abuse of discretion in admitting the videotape. This assignment of error is overruled.

**[13]** By his next assignment of error, defendant argues that the trial court erred by allowing the State on two occasions to introduce improper opinion evidence in violation of Rules 701 and 702 of the North Carolina Rules of Evidence. We disagree.

In the first instance, Sergeant Wilson testified that he examined the inside of defendant's truck and found some red dots in the cab to be red oxide primer (as opposed to blood). Defendant contends that Sergeant Wilson was not qualified to give this testimony because he was not a chemical expert. Rule 701 permits a lay witness to testify to opinions or inferences which are (a) rationally based on the percep-tion of the witness, and (b) helpful to a clear understanding of his tes-timony or the determination of a fact in issue. N.C.G.S. § 8C-1, Rule

701 (1992). Sergeant Wilson testified that the spots in defendant's truck looked peculiar, so he sanded a spot with a knife and discovered it to be red oxide primer. He also testified that he held a part-time job doing car repair and body shop work. Based on his experience, it is likely that Sergeant Wilson could perceive the difference between blood and red oxide primer. Further, Sergeant Wilson's discovery of paint rather than blood contradicted defendant's statement that he hit Natalie with his truck and that she was bleeding when he put her in the truck. Thus, the testimony was helpful to a determination of a fact in issue. We therefore conclude that the trial court properly allowed this testimony.

[14] Defendant also contests admission of the opinion testimony of Agent Lucy Milks. Milks testified as an expert in forensic serology and opined that blood found in the laundry room of defendant's house was consistent with Natalie's. However, when describing the two blood types, Milks stated that Natalie's blood was Hemoglobin Type 1, while the blood found in the laundry room was Hemoglobin Type A. Defendant argues that this difference in blood type means that Milks' opinion with respect to consistency between blood types was contrary to the facts and should have been stricken.

The portion of Milks' testimony about which defendant complains was not objected to at trial, nor did defendant make a motion to strike. Defendant also failed specifically and distinctly to contend that the error amounts to plain error, thereby waiving appellate review under Rule 10(c)(4). *See State v. Hamilton*, 338 N.C. 193, 208, 449 S.E.2d 402, 411 (1994). Even if this assignment of error had been properly preserved, defendant still is not entitled to relief. First, there is no such thing as Hemoglobin Type 1 blood. Second, Milks testified that the blood from the laundry room was consistent with hemoglobin from both defendant and Natalie. She then correctly testified that defendant's hemoglobin was Type A. We therefore conclude that the inaccurate statement was no more than a *lapsus linguae* on the part of the witness. This assignment of error is overruled.

[15] By another assignment of error, defendant contends that the trial court erred in permitting FBI Agent Robert Durdack to testify regarding a scenario he presented to defendant while interviewing him regarding Natalie's death. The State wished to call Durdack for the purpose of showing that defendant's explanation about accidentally hitting Natalie with his truck originated from an interviewing

technique the agent employed in which he suggested this version of events to defendant in order to elicit a response from him. However, before the State called Durdack as a witness, the trial court conducted a hearing to determine the permissible scope of Durdack's testimony. At the hearing defense counsel argued that the scenario was derived from oral statements defendant made to Durdack and that by failing to disclose the substance of these statements to defendant, the State violated the trial court's discovery order. Defendant contended that evidence regarding the scenario thus should be suppressed as a discovery sanction.

Durdack testified at the hearing. On cross-examination by defense counsel, he stated he was aware that defendant had a truck and that he thought he may have acquired that information from defendant. As a result, the trial court initially held that evidence concerning the proposed scenario must be excluded because it was derived from information defendant provided to Durdack. The State was then allowed to recall Durdack, whereupon he testified that the information he included in the scenario was obtained from Asheboro police officers, not from defendant. Upon further consideration, the trial court ruled that the information upon which Durdack based his scenario was gleaned from other officers, and therefore the State's failure to provide the substance of the scenario to defendant did not constitute a violation of the discovery order. Accordingly, the trial court concluded that Durdack's testimony was admissible.

Defendant now contends that the trial court abused its discretion in reversing its original ruling and allowing Durdack to testify about the proposed scenario. For the trial court to be reversed for an abuse of discretion, there must be a "showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Hayes*, 314 N.C. 460, 471, 334 S.E.2d 741, 747 (1985). As we read the transcript, the only colorable discrepancy in Durdack's testimony is that he initially said he *thought* the information that defendant had a truck came from defendant. However, he subsequently testified that he had been fully briefed on the case by the Asheboro police officers prior to interviewing defendant. Further, in response to the trial court's specific question, the agent firmly stated that the elements that he included in the scenario were obtained from the officers, not from defendant. He also testified that his interview with defendant revealed no new facts or information. Because there is competent evidence in the record to support the trial court's finding that Durdack knew defendant drove a truck prior to talking with defendant, we

cannot conclude that the trial court abused its discretion in this matter. This assignment of error is overruled.

[16] Defendant next contends that the trial court erred in permitting the prosecutor to make several prejudicial statements during closing arguments. Defendant asserts that the prosecutor's arguments contained improper statements of his own personal beliefs and opinions as well as statements not based upon any reasonable interpretation of the evidence.

We note that:

"[C]ounsel [generally] will be allowed wide latitude in the argument of hotly contested cases. Counsel for each side may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together with the relevant law so as to present his or her side of the case. Decisions as to whether an advocate has abused this privilege must be left largely to the sound discretion of the trial court."

*State v. Brown*, 320 N.C. 179, 194, 358 S.E.2d 1, 12-13 *(quoting State v. Huffstetler*, 312 N.C. 92, 112, 322 S.E.2d 110, 123 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985)) (citations omitted), *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

Defendant first complains specifically about the following remarks:

But [Natalie] lives here, the hospital's here, and he takes her to Randleman. Where is the child in Randleman, but [Ms. Craven] says he says in the house. And she calls the police and goes out in the yard and is upset, as any mother would be, because he says she's dead. I took her there to clean here [sic] up. She's dead in Randleman. I ran over her with my truck. But instead of going to the hospital, she says why didn't you go to the hospital—

. . . .

But instead of going to the hospital he goes to Randleman, the residence down there.

Defendant contends that there was no evidence that Craven asked defendant why he did not take Natalie to the hospital. While there is no explicit testimony to this effect, there was testimony as to the proximity of the Randolph County hospital to Craven's apartment and of defendant's claim that he took Natalie to the Randleman house, not

the hospital, in order to clean her and to see how badly she was hurt. In this context the prosecutor's remarks were not an expression of his personal opinion, but rather a factually based argument emphasizing the fallacy of defendant's explanation.

[17] Defendant also excepts to a portion of the prosecutor's closing argument in which he stated:

> The story just didn't fit the light of day. Look at her injuries. The back injuries of Natalie Osborne. You will recall the doctor saying that the curve, the little bruises fit, the curves, a person's hand, an adult hand as he holds down a little four-year-old—
>
> . . . .
>
> . . . and forcibly has intercourse with her, and forcibly tears her vagina, bruising her labia and causing bleeding in her vagina, and I submit crying and moaning, as he said.

Defendant contends the prosecutor's argument amounted to impermissible speculation as to facts not in evidence because there was no testimony indicating that defendant held Natalie down and forcibly raped her while she cried and moaned. We disagree.

The prosecutor's argument did not misstate or manipulate the evidence. Rather, it was an accurate synthesis of the evidence presented against defendant. Dr. Clark testified that Natalie's injuries were indicative of forced sexual intercourse which occurred at or near the time of death. He also testified that Natalie's body was covered in bruises which were small and rounded and had the distribution and shape of an adult hand. Defendant himself told Lieutenant McIver that Natalie had made gurgling and gagging noises and that she was alive when he took her clothes off in the bathroom at the Randleman residence. It would be reasonable, if not likely, for the jury to infer from this evidence that defendant physically restrained Natalie while he forced himself upon her and that Natalie cried out in fear and pain during the ordeal.

[18] Defendant next contends that the trial court erred when it allowed the prosecutor to argue that he "spoke for Natalie . . . who died needlessly, mercilessly . . . to fulfill the sick desires of the Defendant Jeffrey Kandies." The evidence is sufficiently clear that defendant sexually assaulted Natalie and that the killing followed as a part of the same violent transaction. It was not too speculative for the jury to infer that defendant committed these acts against a four-

year-old girl with an intent to satisfy his perverse desires. *Cf. State v. Zuniga*, 320 N.C. 233, 256, 357 S.E.2d 898, 913 (not too speculative for jury to infer that defendant committed rape and murder of seven-year-old child with intent to satisfy his desire), *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987).

**[19]** Finally, within this same assignment of error, defendant excepts to the prosecutor's statement that Dr. Clark testified that Natalie was raped. Defendant contends that the State's evidence of rape was weak and inconsistent and that this argument was a misstatement of law which enabled the prosecutor to improperly characterize the expert's testimony as a conclusion of law.

Clark testified that Natalie's injuries were "most indicative of forced intercourse." The statutory definition of rape includes vaginal intercourse (1) with a victim who is a child under the age of thirteen and where the defendant is at least twelve years old and is at least four years older than the victim; or (2) with another person by force and against the will of the other person, inflicting serious personal injury. N.C.G.S. § 14-27.2(a) (1993). Under either definition, the prosecutor's characterization of Clark's testimony and what Clark actually said are entirely consistent. Further, the trial court repeatedly cautioned the jurors that final arguments are not evidence and instructed that they were to be guided by their own recollection of the evidence. It is presumed that the jury followed the trial court's instructions. *State v. Jennings*, 333 N.C. 579, 618, 430 S.E.2d 188, 208, *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 602 (1993).

For the foregoing reasons, we conclude that the jury arguments of the prosecutor during the guilt phase did not amount to prejudicial error. Accordingly, this assignment of error is overruled.

SENTENCING PHASE

The trial court submitted to the jury two aggravating circumstances: that the murder was committed by defendant while he was engaged in the commission of first-degree rape, N.C.G.S. § 15A-2000(e)(5) (Supp. 1995), and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). The jury found both aggravating circumstances to exist.

**[20]** Defendant argues, for a variety of reasons, that the trial court erred in submitting the especially heinous, atrocious, or cruel aggravating circumstance. Defendant first contends that this circumstance is unconstitutionally vague. He concedes, however, that we have con-

sistently rejected this claim. *Syriani*, 333 N.C. at 388-92, 428 S.E.2d at 139-41. We find no compelling reason to revisit the matter here.

**[21]** Defendant additionally argues that the facts separate from the rape were insufficient to support the trial court's submission of the especially heinous, atrocious, or cruel aggravating circumstance. Because the evidence of rape also supported submission of the aggravating circumstance that the murder was committed during the commission of first-degree rape, defendant contends that submission of both circumstances amounted to double counting.

We have stated that the especially heinous, atrocious, or cruel aggravating circumstance is appropriate when the level of brutality involved exceeds that normally found in first-degree murders or when the murder in question is conscienceless, pitiless, or unnecessarily torturous to the victim. *State v. Hamlet*, 312 N.C. 162, 174-75, 321 S.E.2d 837, 845-46 (1984); *State v. Goodman*, 298 N.C. 1, 24-25, 257 S.E.2d 569, 585 (1979). It also arises when the killing demonstrates an unusual depravity of mind on the part of the defendant. *State v. Stanley*, 310 N.C. 332, 345, 312 S.E.2d 393, 401 (1984). Among the types of murders that meet the above criteria are those that are physically agonizing or otherwise dehumanizing to the victim and those that are less violent but involve the infliction of psychological torture. *State v. Oliver*, 309 N.C. 326, 346, 307 S.E.2d 304, 318 (1983).

Double counting arises when two aggravating circumstances are supported by the same evidence. *Quesinberry*, 319 N.C. at 240 n.1, 354 S.E.2d at 453 n.1. In *Goodman*, 298 N.C. at 29, 257 S.E.2d at 587, this Court held it improper to submit two aggravating circumstances supported by the same evidence. "Where, however, there is separate evidence supporting each aggravating circumstance, the trial court may submit both 'even though the evidence supporting each may overlap.'" *State v. Rouse*, 339 N.C. 59, 97, 451 S.E.2d 543, 564 (1994) (quoting *State v. Gay*, 334 N.C. 467, 495, 434 S.E.2d 840, 856 (1993), *cert. denied*, —— U.S.—— , 133 L. Ed. 2d 60 (1995)).

In determining whether there is sufficient evidence to submit a particular aggravating circumstance, the trial court must consider the evidence in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *Syriani*, 333 N.C. at 392, 428 S.E.2d at 141. Here, the State's evidence tended to show that Natalie was savagely beaten, strangled, and sexually assaulted by a man whom she knew and trusted. When discovered,

she was in a trash bag buried in the recesses of a closet, bloodied and naked, with her soiled clothes piled on top of her. An autopsy showed that Natalie had suffered two blunt-force lacerations to the top of her head. The right side of her head was fractured, and there were seven separate bone fragments in the area, one of which had penetrated the brain and caused a hemorrhage. There were multiple bruises on her face, back, neck, sides, and chest. An abrasion on the front of the neck measuring one-inch wide and approximately two and one-half inches long indicated manual strangulation. There was some discoloration around the rectum, bruises on both sides of the vagina, and blood deep within the vaginal canal.

The pathologist opined that Natalie died as a result of blunt-force injury to the head. While she probably lost consciousness soon after the painful blows, none of the injuries would have caused her heart to stop beating immediately. Therefore, it was several excruciating moments before she actually died.

This evidence, viewed in the light most favorable to the State, was sufficient to support a reasonable inference that Natalie suffered great physical pain as a result of being brutally beaten, raped with sufficient violence to cause bleeding in her vagina, and strangled so forcefully that her neck was scratched. It also supports an inference that the murder was dehumanizing and psychologically torturous. The pathologist testified that Natalie's pelvic injuries occurred at or near the time of death. When a murder occurs during the perpetration of a violent sexual assault, it is unusually dehumanizing and debasing. *State v. Artis*, 325 N.C. 278, 318, 384 S.E.2d 470, 492-93 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Further, defendant abused the trust of a four-year-old girl and violated her in multiple ways. A reasonable jury could infer that Natalie experienced terror, confusion, and anguish from the moment defendant drove off with her in the truck until her last breath.

Taken as a whole, the evidence of Natalie's physical and psychological suffering and of the brutal, dehumanizing nature of the killing was sufficient to support the submission of this aggravating circumstance. While the evidence of rape contributed to this unique combination of factors, ample independent evidence existed to justify submission. We conclude that under the facts of this case, the jury was properly permitted to find both that the murder was committed while defendant was engaged in the commission of first-degree rape and that the murder was especially heinous, atrocious, or cruel.

**[22]** Under this same assignment of error, defendant alternatively argues that the trial court erred in not instructing the jury that it could not consider the same evidence to find more than one aggravating circumstance. Defendant neither objected to the instructions given nor requested limiting instructions. Therefore, this claim must be reviewed under the plain error standard, which requires defendant to show that the error was so fundamental that the result would probably have been different absent the error. *Rouse*, 339 N.C. at 99, 451 S.E.2d at 565. In light of our holding that there was independent evidence supporting each aggravating circumstance, defendant has not shown that any error in the instructions likely affected the outcome. This assignment of error is overruled.

**[23]** By another assignment of error, defendant contends that the prosecutor argued matters not supported by the evidence and improperly expressed his personal beliefs and opinions during closing arguments in the sentencing proceeding. First, defendant contests the prosecutor's arguments regarding what Natalie was thinking, feeling, and saying during the commission of the rape and murder. Second, defendant objects to what he characterizes as an improper argument by the prosecutor that the victim's age was an aggravating circumstance.

Counsel is allowed wide latitude in the jury argument in both the guilt and sentencing phases. *Artis*, 325 N.C. at 324, 384 S.E.2d at 496. However, the objectives of the arguments in the two phases are different, and rhetoric that may be prejudicially improper in the guilt phase is acceptable in the sentencing phase. *Id.* Further, the prosecutor's closing remarks must be taken in the context of his role as a zealous advocate for criminal convictions. *State v. McCollum*, 334 N.C. 208, 227, 433 S.E.2d 144, 154 (1993), *cert. denied* — U.S. —, 129 L. Ed. 2d 895 (1994).

In *State v. King*, 299 N.C. 707, 711-13, 264 S.E.2d 40, 43-44 (1980), this Court found that the prosecutor's closing remarks concerning what the victim must have been thinking as he was dying were not so grossly improper as to require the trial court to intervene *ex mero motu*. Likewise, we conclude here that given the overwhelming evidence against defendant, the prosecutor's argument regarding what Natalie was thinking and feeling while defendant beat and raped her, if error, was not prejudicial.

Defendant further contends that the prosecutor used the victim's age to persuade the jury to recommend the death penalty.

The prosecutor may not argue an aggravating factor not supported by the evidence or not included in the statutory list of aggravating factors found in N.C.G.S. § 15A-2000(e). Likewise, a jury may not base its sentencing recommendation on an improper aggravating factor. Where there is evidence to support the aggravating factors relied upon by the State, however, the jury's balancing of aggravation and mitigation will not be disturbed unless it appears that the jury acted out of passion or prejudice or made its sentence arbitrarily.

*Zuniga*, 320 N.C. at 273, 357 S.E.2d at 923 (footnote omitted) (citations omitted). There was ample evidence to support the jury's finding of the aggravating circumstances that the killing was accomplished during the first-degree rape and that the murder was especially heinous, atrocious, or cruel. Nothing in the record suggests that the jury made its recommendation based upon passion or prejudice or that it acted arbitrarily. The prosecutor's references to Natalie's age merely emphasized the brutality of the crime as well as the depravity of defendant's acts. We therefore overrule this assignment of error.

PRESERVATION ISSUES

[24-26] Defendant raises three additional issues which he concedes this Court has decided against his position: (1) the trial court erred in making found mitigating circumstances discretionary when the jury considered Issues Three and Four, (2) the trial court erred in denying defendant's request to instruct the jury that defendant would be sentenced to life in prison for his conviction of first-degree rape, and (3) the trial court erred in denying defendant's request to question jurors regarding their beliefs about parole eligibility.

We have considered defendant's arguments on these issues, and we find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

PROPORTIONALITY REVIEW

[27] Having found no error in the guilt-innocence and sentencing phases, we are required by statute to review the record and determine (1) whether the evidence supports the aggravating circumstances found by the jury; (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence of death is excessive or disproportionate to

the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

The trial court submitted two aggravating circumstances to the jury: that this murder was committed while defendant was engaged in the commission of first-degree rape, N.C.G.S. § 15A-2000(e)(5), and that this murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). The jury found both aggravating circumstances to exist. We conclude that the evidence supported the jury's finding of each aggravating circumstance. We further conclude that the jury did not sentence defendant to death under the influence of passion, prejudice, or any other arbitrary factor. We now turn to our final statutory duty and determine whether the sentence of death in this case is excessive or disproportionate.

One purpose of proportionality review "is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden,* 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield,* 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). We compare this case to others in the pool, which we defined in *State v. Williams,* 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 177 (1983), and *State v. Bacon,* 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 1083 (1995), that "are roughly similar with regard to the crime and the defendant." *State v. Lawson,* 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied,* 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green,* 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 547 (1994).

This case has several distinguishing characteristics: defendant was found guilty of first-degree murder based on both the felony murder rule and on premeditation and deliberation; the jury found the murder to be especially heinous, atrocious, or cruel; the victim was a four-year-old girl who knew and trusted defendant; the murder occurred during the commission of a sexual assault; the victim suffered great physical pain in that she was brutally beaten, strangled, and raped; and defendant concealed the body and then purposefully misled police for several days regarding its location.

This Court has determined that the sentence of death was disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We find the instant case distinguishable from each of these. None involved the murder of a child. *State v. Walls*, 342 N.C. 1, 71, 463 S.E.2d 738, 776-77 (1995). Further, we have never found a death sentence disproportionate in a case involving a victim of first-degree murder who also was sexually assaulted. *State v. Payne*, 337 N.C. 505, 537, 448 S.E.2d 93, 112 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 292 (1995).

Defendant attempts to liken this case to six cases involving sexual assault in which the jury recommended life sentences. Our review of these cases reveals that the case before us is distinguishable.

In three—*State v. Fincher*, 309 N.C. 1, 305 S.E.2d 685 (1983); *State v. Franklin*, 308 N.C. 682, 304 S.E.2d 579 (1983), *overruled on other grounds by State v. Parker*, 315 N.C. 222, 337 S.E.2d 487 (1985); *State v. Powell*, 299 N.C. 95, 261 S.E.2d 114 (1980)—the sole basis for the conviction was felony murder. Here, defendant was convicted of murder by premeditation and deliberation and under the felony murder rule. We have stated that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *Artis*, 325 N.C. at 341, 384 S.E.2d at 506.

In another—*State v. Prevette*, 317 N.C. 148, 345 S.E.2d 159 (1986)—the jury rejected the submitted aggravating circumstance that the murder was especially heinous, atrocious, or cruel;[1] the jury here found that circumstance upon ample evidence. We have upheld the death penalty as proportionate in many cases in which the especially heinous, atrocious, or cruel aggravating circumstance has been found to exist. *Artis*, 325 N.C. at 341, 384 S.E.2d at 506.

In the remaining two cases—*State v. Temple*, 302 N.C. 1, 273 S.E.2d 273 (1981); *State v. Clark*, 301 N.C. 176, 270 S.E.2d 425 (1980)—there was no evidence of sexual intercourse, and there was no apparent relationship between the defendants and their victims.

---

1. We base this on the record in *Prevette*, which remains a part of this Court's records.

STATE v. KANDIES

[342 N.C. 419 (1996)]

Here, by contrast, there is substantial evidence of rape and sexual assault, and the victim was a four-year-old girl who knew and trusted defendant. As we have stated before, the murder of a young child particularly shocks the conscience. *Artis*, 325 N.C. at 344, 384 S.E.2d at 508.[2]

For the foregoing reasons, we conclude that each of these cases in which the jury recommended life imprisonment is distinguishable from the present case. Further, defendant's case is more comparable to those cases in which the death sentence was affirmed. *E.g.*, *McCollum*, 334 N.C. 208, 433 S.E.2d 144 (first-degree felony murder conviction and death sentence upheld where defendant and three other males "gang" raped and asphyxiated eleven-year-old girl); *Zuniga*, 320 N.C. 233, 357 S.E.2d 898 (death sentence upheld where defendant stabbed and killed a seven-year-old girl during the commission of first-degree rape).

The evidence here indicates that defendant snatched four-year-old Natalie Osborne from her front yard and took her to his house in Randleman, where he raped her, strangled her, and brutally beat her to death. After comparing this case to other "similar cases" used for proportionality review, we conclude that it falls within the category of first-degree murders for which we have previously upheld the death penalty as proportionate. Thus, based upon the characteristics of this defendant and the crime he committed, we are convinced the sentence of death was neither excessive nor disproportionate.

Having considered and rejected all of defendant's assigned errors, we hold that defendant received a fair trial and sentencing proceeding, free of prejudicial error.

NO ERROR.

---

2. While *Artis* is presently no longer in the proportionality pool, the principle remains the same.