STATE OF NORTH CAROLINA v. REX DEAN PENLAND

No. 139A94

(Filed 31 July 1996)

**1. Rape and Allied Offenses §§ 90, 110 (NCI4th)— rape and sexual offense—sufficiency of evidence—offenses committed by force and against victim's will**

The trial court did not err by denying defendant's motion to dismiss charges of first-degree rape and first-degree sexual

offense where defendant contended that there was insufficient evidence that the offenses were committed by force and against the victim's will. There was substantial evidence from which the jury reasonably could find that defendant used actual or constructive physical force sufficient to overcome any resistance the victim might have offered and evidence of physical resistance is not necessary to prove lack of consent. Here, the victim's fear of defendant was specific to the events leading to defendant's sexual assaults on and murder of her.

**Am Jur 2d, Rape §§ 88 et seq.; Sodomy § 45.**

**Sufficiency of allegations or evidence of serious bodily injury to support charge of aggravated degree of rape, sodomy, or other sexual abuse. 25 ALR4th 1213.**

2. **Rape and Allied Sexual Offenses §§ 97, 113 (NCI4th)— rape and sexual offense—defendant was aided and abetted—sufficiency of evidence**

There was sufficient evidence of first-degree sexual offense and first-degree rape on the basis that defendant was aided and abetted where defendant alleged that the State presented no evidence that the Sapp brothers, who cooperated with the State, did anything to encourage, instigate, advise, or counsel defendant to engage in any sexual acts with the victim and merely proved that the Sapps were present. Although mere presence at the crime scene is insufficient to support a finding that a person is an aider and abettor, presence alone may be regarded as encouragement when the bystander is a friend of the perpetrator who knows his presence will be regarded as an encouragement. Here, viewed in the light most favorable to the State, the evidence showed that defendant was the Sapp brothers' uncle and that the Sapps were present when defendant picked up the victim, swore at her, hit her in the face, and demanded that she put on handcuffs; not only were the Sapps in close proximity when defendant forced the victim to perform fellatio upon him and to have sexual intercourse with him, but Larry participated in the sexual acts, and both brothers complied with defendant's request to tie the victim to a tree; and their presence inside and outside the truck while defendant engaged in sexual acts with the victim could reasonably have been regarded as encouragement to defendant and constitutes sufficient evidence that they and defendant shared

STATE v. PENLAND

[343 N.C. 634 (1996)]

the community of unlawful purpose necessary for aiding and abetting.

**Am Jur 2d, Rape § 28; Sodomy §§ 89, 90.**

**Prosecution of female as principal for rape. 67 ALR4th 1127.**

3. **Rape and Allied Sexual Offenses §§ 189, 203 (NCI4th)— first-degree rape and first-degree sexual offense—failure to charge on lesser offenses—no error**

There was no plain error in a prosecution for first-degree rape, first-degree sexual offense, first-degree murder, and first-degree kidnapping where the court did not instruct the jury on second-degree rape and second-degree sexual offense as lesser included offenses based on insufficient evidence that defendant was aided and abetted. Defendant did not object to the instructions given, did not request instructions on the lesser offenses, and there was no evidence to support instructions on second-degree rape and second-degree sexual offense in that defendant's evidence did not tend to negate the evidence that his nephews aided and abetted him. Rather, defendant stated that he did not remember the evening's events and his testimony suggested that the nephews were the perpetrators. Based on the evidence, the jury could have found defendant guilty of first-degree rape and first-degree sexual offense or not guilty.

**Am Jur 2d, Rape § 110; Sodomy § 95.**

**Propriety of lesser-included-offense charge to jury in federal sex-crime prosecution. 100 ALR Fed. 535.**

4. **Kidnapping and Felonious Restraint § 31 (NCI4th); Rape and Allied Sexual Offenses § 90 (NCI4th)— first-degree kidnapping to commit rape—prostitute—withdrawal of consent**

There was sufficient evidence to permit the jury to find beyond a reasonable doubt that defendant committed first-degree kidnapping where defendant argued that the evidence was insufficient to prove that he formed an intent to rape the victim prior to or during the removal because all of the evidence tended to show that the victim got into the truck for the purpose of engaging in prostitution. The evidence indicates that defendant never intended to pay her for sexual services and, given the circum-

STATE v. PENLAND

[343 N.C. 634 (1996)]

stances, the jury could reasonably infer (1) that defendant would have known the victim's prior consent to sexual activity had been withdrawn, and (2) that his threats and actions compelled her submission and overcame her will, thereby negating her earlier consent.

**Am Jur 2d, Abduction and Kidnapping § 12; Rape §§ 7, 10, 11.**

**Seizure or detention for purpose of committing rape, robbery, or similar offense as constituting separate crime of kidnapping. 43 ALR3d 699.**

5. **Evidence and Witnesses § 376 (NCI4th)— kidnapping, rape, murder—testimony of similar acts with prior girlfriend**

The trial court did not err in a prosecution arising from an abduction, rape and murder by admitting testimony from an ex-girlfriend concerning prior bad acts defendant allegedly committed. Even if defendant had preserved this argument for appeal, the incidents with the ex-girlfriend and the victim involved assaults on a female in remote wooded areas in which defendant used a knife to threaten or intimidate the female, tied her to a tree, slapped or beat her, used handcuffs and verbally abused his victim. Given the commonality of the distinct and bizarre behaviors, the ten-year gap between the incidents did not negate the plausibility of the existence of an ongoing and continuous plan to engage in such activities. In light of the limiting instruction, the probative value of the evidence was not substantially outweighed by its prejudicial impact.

**Am Jur 2d, Evidence §§ 448, 450.**

**Admissibility, in prosecution for sexual offense, of evidence of other similar offenses. 77 ALR2d 841.**

**Construction and application of Rule 608(b) of Federal Rules of Evidence dealing with use of specific instances of conduct to attack or support credibility. 36 ALR Fed. 564.**

**Admissibility, under Rule 404(b) of the Federal Rules of Evidence, of evidence of other crimes, wrongs, or acts similar to offense charged to show preparation or plan. 47 ALR Fed. 781.**

**6. Evidence and Witnesses § 761 (NCI4th)— abduction, rape, capital murder—defendant's comment regarding handcuffs—similar testimony without objection**

The trial court did not err in a prosecution for first-degree murder, first-degree rape, first-degree sexual offense, first-degree kidnapping, conspiracy to commit rape and conspiracy to commit kidnapping in which there was evidence that the victim had been handcuffed and assaulted by admitting testimony that defendant had always said that he was going to handcuff Sherry Fultz (not the victim) and "beat the hell out of her." The State had previously introduced without objection similar testimony of three sisters that defendant possessed handcuffs or had threatened to use handcuffs on them.

**Am Jur 2d, Evidence § 1435.**

**7. Evidence and Witnesses § 3224 (NCI4th)— capital murder—accomplices testifying against defendant—character for truthfulness—sixth grade teacher**

The trial court did not err in a prosecution arising from an abduction, rape and murder by admitting testimony from the sixth-grade teacher of defendant's accomplices, who testified against him, of the good character of the accomplices for truthfulness. The fact that the witness's knowledge of their reputation for truthfulness related to a time six years earlier affected only weight, not admissibility.

**Am Jur 2d, Evidence § 374.**

**8. Criminal Law § 754 (NCI4th)— capital murder, kidnapping, rape—instructions—proof of identity**

There was no prejudicial error in a prosecution arising from an abduction, rape and murder in not giving the instruction requested by defendant that the State had the burden of proving beyond a reasonable doubt defendant's identity as the perpetrator. Defendant's identity as the perpetrator was not seriously in question and, even if it was an issue, the court indicated in instructing on each of the offenses that the State was required to prove beyond a reasonable doubt that defendant committed their various elements.

**Am Jur 2d, Trial §§ 1370-1372.**

STATE v. PENLAND

[343 N.C. 634 (1996)]

9. **Criminal Law § 468 (NCI4th)— capital murder—prosecutor's argument—explanation of reasonable doubt**

The trial court did not err in a prosecution arising from an abduction, rape and murder by not intervening *ex mero motu* in the prosecutor's explanation of reasonable doubt where the prosecutor stated that reasonable doubt is more than a possibility of innocence, that it is not a vain or imaginary doubt, and that the jury should not have any reasonable, substantial or significant doubt. The trial court properly instructed the jury on reasonable doubt and this instruction cured any error in the prosecutor's closing argument.

**Am Jur 2d, Trial § 645.**

**Counsel's right in criminal prosecution to argue law or to read lawbooks to the jury. 67 ALR2d 245.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

10. **Criminal Law § 433 (NCI4th)— capital murder—prosecutor's argument—defendant's character**

The trial court did not err in a prosecution arising from an abduction, rape, and murder by not intervening *ex mero motu* in the prosecutor's argument where defendant contended that the prosecutor improperly invited the jury to infer defendant's guilt from evidence of defendant's bad character. Counsel are generally allowed wide latitude in the argument of hotly contested cases and may argue facts in evidence and each of these comments was supported by the evidence or set forth an inference the jury could draw therefrom.

**Am Jur 2d, Trial §§ 681, 682.**

**Prejudicial effect of prosecutor's comment on character or reputation of accused, where accused has presented character witnesses. 70 ALR2d 559.**

**Negative characterization or description of defendant, by prosecutor during summation of criminal trial, as ground for reversal, new trial, or mistrial—modern cases. 88 ALR4th 8.**

STATE v. PENLAND

[343 N.C. 634 (1996)]

Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.

11. **Criminal Law § 1355 (NCI4th)— capital sentencing—mitigating circumstances—no significant history or prior criminal activity**

The trial court did not err in a first-degree murder prosecution by not submitting the statutory mitigating circumstance of no significant history of prior criminal activity where evidence was adduced at trial that defendant had been convicted of breaking and entering and larceny, larceny of a vehicle, three counts of forgery and uttering, assault on a female, and driving while impaired; he had served at least six months in prison in 1991-92 and had been imprisoned at least three times; and he acknowledged that at that time he was charged with backhanding his wife in response to her choking him and that his license was revoked. Although defendant asserts that a rational juror could have concluded that he had no significant history of prior criminal activity because of the age of some of his convictions, the allegedly nonviolent nature of all of them, and the fact that they were a product of his alcoholism, the cases on which defendant relies involved the mitigator being submitted over defendant's objection and the N.C. Supreme Court has held that similar histories barred submission of the mitigator. Given the nature and extent of defendant's prior criminal history and the nature of the outstanding charges against him, the trial court properly could have found that no reasonable juror would deem defendant's criminal history insignificant.

Am Jur 2d, Criminal Law § 628.

Court's right, in imposing sentence, to hear evidence of, or to consider, other offenses committed by defendant. 96 ALR2d 768.

Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.

STATE v. PENLAND

[343 N.C. 634 (1996)]

Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.

12. **Criminal Law § 1357 (NCI4th)— capital sentencing—mitigating circumstances—mental or emotional disturbance**

The trial court did not err in a first-degree murder prosecution by not submitting the statutory mitigating circumstance that he was under the influence of a mental or emotional disturbance where, in context, the court in effect submitted the circumstances of mental or emotional disturbance and impaired capacity. Even assuming that the court did not, the jurors must have considered this evidence since they in fact found the four nonstatutory mitigating circumstances which the court related to those two circumstances.

**Am Jur 2d, Criminal Law § 628.**

**Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

**Modern status of test of criminal responsibility—state cases. 9 ALR4th 526.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

13. **Criminal Law § 455 (NCI4th)— capital sentencing—prosecutor's argument—need to justify life sentence—deterrence**

There was no error in a capital sentencing proceeding where defendant asserted that the State's argument suggested that the jurors would have to justify a verdict of life imprisonment to the prosecutor and the citizens of the county and that a life sentence could be justified only if the jury could guarantee beyond a reasonable doubt that defendant would never kill again. Taken in context, the arguments suggested that the only way to prevent defendant from killing again was for the jury to return a death sentence; this type of specific deterrence argument has been consistently upheld. Moreover, the trial court subsequently instructed that the burden was on the State to prove the existence of an aggravating circumstance which outweighed any existing mitigating circumstances and which was sufficiently substantial

to warrant a recommendation of death. Any error in the prosecutor's argument could not have denied defendant due process and did not require a new trial.

**Am Jur 2d, Trial § 572.**

**Propriety, under Federal Constitution, of evidence or argument concerning deterrent effect of death penalty. 78 ALR Fed. 553.**

**14. Criminal Law § 454 (NCI4th)— capital sentencing—prosecutor's argument—mitigating circumstances**

There was no error requiring intervention *ex mero motu* in a first-degree murder sentencing hearing where defendant contended that the State improperly argued that the mitigating circumstances were in fact aggravating circumstances. When read in context, the comments were attacks on the weight of the mitigating circumstances. Even assuming that they were improper, the trial court properly instructed the jury that only those circumstances identified by statute may be considered as aggravating circumstances and only the five aggravating circumstances submitted were listed on the Issues and Recommendation as to Punishment form. Accordingly, the jury could not have considered mitigating circumstances as aggravating circumstances. Furthermore, a psychologist testified that defendant had a history of antisocial acts and, under those circumstances, the prosecutor's comment that defendant had an antisocial personality disorder did not require the trial court to intervene.

**Am Jur 2d, Trial § 572.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

**15. Jury § 229 (NCI4th)— capital murder—jury selection—juror initially uncertain, then opposed to death—excusal for cause**

A prospective juror was not erroneously excused for cause from a first-degree murder prosecution because of his personal

beliefs concerning the death penalty where, despite his specula-
tion that there might be some cases in which he would agree to
the death penalty, the juror subsequently asserted that he did not
think he could follow the court's instructions that required impos-
ing the death sentence.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment
as disqualifying juror in capital case—post-*Witherspoon*
cases. 39 ALR3d 550.**

16. **Criminal Law § 1373 (NCI4th)— death penalty—not
disproportionate**

A sentence of death was not imposed under the influence of
passion, prejudice, or other arbitrary factors and was not exces-
sive and disproportionate where the evidence supported the
jury's finding of each aggravating circumstance and the jury did
not sentence defendant to death under the influence of passion,
prejudice, or any other arbitrary factor, this case is distinguish-
able from each of the seven cases where a death sentence was
found disproportionate, cases cited by defendant in which juries
have imposed life sentences are distinguishable in that here the
jury convicted defendant of first-degree murder on the theories of
premeditation and deliberation, felony murder, and murder by
torture; none of the cases defendant cited involved the same
aggravating circumstances as here and none involved a defendant
who stabbed his victim fourteen times after having kidnapped,
raped, and sexually assaulted her; and this case is similar to cases
where the death penalty was found proportionate.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty,
to establish statutory aggravating circumstance that mur-
der was heinous, cruel, depraved, or the like—post-*Gregg*
cases. 63 ALR4th 478.**

**Validity of death penalty, under Federal Constitution,
as affected by consideration of aggravating or mitigating
circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment
imposing a sentence of death entered by Wood, J., at the 24 January
1994 Criminal Session of Superior Court, Stokes County, upon a jury

verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments imposed for first-degree rape, first-degree sexual offense, and first-degree kidnapping was allowed 9 February 1996. Heard in the Supreme Court 12 February 1996.

*Michael F. Easley, Attorney General, by Barry S. McNeill, Special Deputy Attorney General, for the State.*

*James R. Glover for defendant-appellant.*

WHICHARD, Justice.

Defendant was tried capitally for the first-degree murder, first-degree rape, first-degree sexual offense, and first-degree kidnapping of Vernice Alford. He was also charged with conspiracy to commit rape and conspiracy to commit kidnapping. The jury found defendant guilty on all but the conspiracy charges and recommended a sentence of death for the first-degree murder. The trial court sentenced defendant accordingly on the murder charge and sentenced defendant to two consecutive terms of life imprisonment for the rape and sexual offense and to a forty-year term for the kidnapping. Defendant appeals from his convictions and sentences. We hold that defendant received a fair trial, free of prejudicial error, and that the sentence of death is not disproportionate.

The State's evidence tended to show that on 30 November 1992, defendant and his two nineteen-year-old twin nephews, Gary Sapp and Larry Sapp, Jr., left defendant's trailer to go deer hunting. They stopped at a convenience store, at a pool hall, at a Waffle House, and at the Darrell and Sherry Fultz residence. Defendant then drove to Winston-Salem and picked up the victim, Vernice Alford, a waitress and prostitute. He drove to a logging road in Stokes County where he engaged in sexual acts with her. After ordering the Sapp brothers to tie the victim to a tree, defendant assaulted her with a knife and left her there.

The victim died of internal and external bleeding caused by multiple stab wounds. Although vaginal swabs and smears showed the presence of sperm cells, State Bureau of Investigation crime laboratory serologist P.D. Deaver testified that there was not a sufficient quantity of sperm to perform DNA testing.

In the area surrounding the site where the body was found, investigators recovered a Magna brand cigarette butt and a no-name ciga-

rette with a gold ring around the filter, a length of yellow and black cord wrapped loosely around a clump of small trees, an empty forty-ounce King Cobra beer bottle, an empty package of Monarch 100 cigarettes, and footprints from two different pairs of shoes. One print was made by a tennis shoe bearing the brand "Pony" on the sole, like the shoes the victim had worn. The other print was made either by a woman's shoe with a heel or by a cowboy boot. Chips of green paint and tire tracks were also found.

Based on statements made by the Sapp brothers, investigators arrested defendant and searched his residence area. They recovered a green pickup truck whose paint and tires were consistent with the paint chips and tire tracks found in the area of the logging road. They also recovered a pair of handcuffs hanging on a gun rack in the rear of the truck's cab. Fibers found on the handcuffs were consistent with fibers taken from the victim's blue jean jacket. Officers also seized a pair of cowboy boots that defendant put on as he was escorted from the residence.

Like defendant, the Sapp brothers were charged with first-degree kidnapping, first-degree murder, first-degree rape, first-degree sexual assault, conspiracy to commit rape, and conspiracy to commit kidnapping. Larry Sapp, Jr., testified that on the night of the murder, defendant was wearing cowboy boots, Larry was wearing black shoes, and Gary was wearing tennis shoes. Larry and Gary both smoked Magna cigarettes, whereas defendant smoked Monarch 100s, which have a gold band.

Gary Sapp testified that on 30 November 1992, he and defendant traded their aluminum cans for money at the recycling center in Kernersville. On the way back to the Sapps' trailer, defendant's wife bought five forty-ounce bottles of Magnum beer. Defendant and Gary each drank two bottles, and Larry drank the remaining bottle at the Sapps' trailer. That evening, defendant and the Sapp brothers decided to spotlight for deer in some cornfields. Finding no deer, they drove to Rural Hall, where they stopped at a Pantry store and purchased four or five more forty-ounce bottles of Magnum beer. They drove on to King and stopped at the Rack Room. Upon leaving there, they drove to the Waffle House, where defendant went inside and tried to convince Anita Brown to "party" with them. Defendant returned to the truck alone, telling the Sapps that Brown had refused to come. Larry testified that defendant was "really mad" and stated "that bitch ain't nothing but a whore anyway." Defendant then drove to the

Fultzes' residence, where defendant and the Sapps drank beer, and according to Larry, defendant told Sherry she should handcuff Darrell and beat him.

After leaving the Fultzes' residence and buying three forty-ounce bottles of King Cobra beer, defendant drove to Winston-Salem, saying he wanted to pick up a prostitute. Arriving in Winston-Salem at approximately 9:00 p.m., defendant stopped on Patterson Avenue when a black female flagged him down. She opened the passenger side door and sat in the front seat. As the woman repeatedly asked for money, defendant sped off. Tossing her the handcuffs he had removed from the gun rack, defendant then said, "[S]hut the f--- up and put the handcuffs on, bitch." When the victim looked at defendant and hesitated, defendant hit her in the face, saying, "[P]ut the f----- handcuffs on, bitch, like I told you." The victim said, "Okay, Mister. Okay, Mister," and cuffed her hands in front of her body.

Defendant sped and ran through several stoplights and stop signs on the way to rural Stokes County. Larry testified that the victim was scared and stated, "Please, Mister, don't," and that defendant replied, "Well, all them black girls that got killed out there, I'm the one that did it." Defendant drove down a logging road, rode over a felled tree, and stopped the vehicle. He and the victim exited the truck. Defendant walked to the passenger side and forced the victim's head toward his penis. After the victim performed fellatio upon defendant, he took her to the rear of the truck, where he engaged in sexual intercourse with her as she leaned over and held the bumper. Larry walked to the rear of the truck, and the victim performed fellatio upon him while she was engaged in intercourse with defendant. When defendant stated, "You f----- bitch," Larry stopped the victim from performing oral sex. Defendant and the victim then walked to the driver's side of the truck; defendant pushed the victim onto some logs and again had intercourse with her. Gary testified that defendant stated several times, "I am going to ice this bitch." Larry testified that the victim engaged in all of the sexual acts willingly and voluntarily.

Defendant then led the victim to a tree. Although Gary said to defendant, "Let's go, let's get out of here," defendant insisted, "I'm going to ice this bitch." Defendant asked the Sapp brothers to tie the victim to a tree with a length of yellow and black rope. According to Gary, defendant said he was not going to pay the victim for having sex and was going to leave her there. Gary and Larry wrapped the rope around the victim and the tree four or five times but left the rope

loose so the victim could later extricate herself. Larry testified that while he and Gary were wrapping the rope, the victim asked them several times not to hurt her and stated that she had a child. Larry responded that they would not hurt her. As the Sapp brothers walked back to the truck, defendant angrily yelled, "Why didn't you tie the G------ rope like I told you to?" While Gary and Larry sat in the truck drinking beer, Larry observed defendant standing in front of the victim and saw defendant's arms moving. Defendant returned to the truck within a few minutes, and as he turned on the engine and the headlights, Gary observed the victim walking "kind of bent over."

After leaving the logging road, defendant discovered that the truck had a flat tire. While the Sapps changed it, defendant contacted his wife on the citizens band radio to tell her about the flat tire. Defendant then drove to his residence. Before going inside, defendant and the Sapps walked to the rear of defendant's residence, where defendant tried to burn a length of black and yellow rope. Gary testified that defendant, while burning the rope, said that he "iced that bitch." Defendant also told the Sapps he had stabbed himself in the leg while stabbing the victim. He showed them the knife he usually carried in a sheath on his belt, and it was covered with blood. Three days after the incident, defendant called the Sapp brothers, laughing, and told them the black female had been found. He instructed them not to tell anyone about the incident. Both Sapp brothers testified that on the night of the incident, defendant was "feeling good" but was not drunk.

Defendant testified that he did not remember any of the events after he and the Sapps left the Rack Room because he passed out as a result of consuming more than a case of beer over the course of the day. He claimed that he knew nothing about the killing of the victim, asserting that the Sapp brothers had awakened him to tell him the pickup had a flat tire. He had no memory of stopping at the Waffle House or at the Fultzes'. Defendant denied ever possessing any black and yellow rope and denied burning any such rope after returning to his residence. Although when arrested he had a small wound on his leg, defendant and his fifteen-year-old nephew, Donnie Penland, testified that defendant had injured his leg when he caught his pants on a barbed wire fence they were crossing while deer hunting several days after the murder. Defendant acknowledged that he previously had been to Patterson Avenue with Larry Sapp, Jr., and Donnie Penland and that he had told the Fultzes that Patterson Avenue was a place for picking up prostitutes.

At sentencing defendant presented evidence that his father was an alcoholic and was abusive toward his children. Dr. John Warren, a psychologist, testified that defendant suffered from alcohol dependency and mixed personality disorder and that defendant had intellectual functioning in the bottom six or seven percent of persons his age. Dr. Warren found nothing in his evaluation to suggest that defendant was insane or so intoxicated that he was unable to distinguish right from wrong at the time of the crimes.

[1] Defendant first assigns as error the trial court's denial of his motion to dismiss the charges of first-degree rape and first-degree sexual offense. He contends that the evidence was insufficient to permit the jury to find beyond a reasonable doubt that the sexual intercourse and fellatio were committed by force and against the victim's will.

In ruling on a motion to dismiss, the trial court must consider the evidence in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Bell*, 311 N.C. 131, 138, 316 S.E.2d 611, 615 (1984). Contradictions and discrepancies are for the jury to resolve. *Id.* In deciding whether the trial court's denial of defendant's motion to dismiss violated defendant's due process rights, this Court must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573 (1979).

One common element of first-degree rape and first-degree sexual offense, N.C.G.S. §§ 14-27.2(a)(2), 14-27.4(a)(2) (1986), is that the vaginal intercourse or sexual act must be "by force and against the will" of the victim. This Court has held that such force may be established by either actual physical force or constructive force. Constructive force may be demonstrated by evidence of threats or other actions by the defendant which compel the victim's submission to sexual acts, and such threats "need not be explicit so long as the totality of circumstances allows a reasonable inference that such compulsion was the unspoken purpose of the threat." *State v. Etheridge*, 319 N.C. 34, 45, 352 S.E.2d 673, 680 (1987).

In arguing that the State's evidence was insufficient to establish either that the sexual acts were against the victim's will or that he used the kind of force required for a conviction of rape or sexual offense, defendant relies upon *State v. Alston*, 310 N.C. 399, 312 S.E.2d 470 (1984). *Alston*, however, is distinguishable. In *Alston*,

**STATE v. PENLAND**

[343 N.C. 634 (1996)]

Cottie Brown had engaged in a consensual sexual relationship with the defendant for six months prior to the alleged rape. Brown testified that when she and the defendant engaged in sex, she frequently would remain motionless while the defendant undressed her and had intercourse with her. On the day of the alleged rape, approximately a month after Brown moved out of the defendant's apartment, the defendant approached Brown outside the school she was attending and threatened to "fix" Brown's face. Brown testified that she did not run away from the defendant because she was afraid of him. Instead, after they walked around the neighborhood discussing their relationship, Brown followed the defendant to a friend's apartment and remained motionless while he undressed her and had intercourse with her. This Court held that "absent evidence that the defendant used force or threats to overcome the will of the victim *to resist the sexual intercourse alleged to have been rape*," the victim's "general fear" was not sufficient to show that the defendant used the force required to support a conviction of rape. *Id.* at 409, 312 S.E.2d at 476.

Here, there was substantial evidence from which the jury reasonably could find that defendant used actual or constructive physical force sufficient to overcome any resistance the victim might have offered. Unlike in *Alston*, defendant and the victim were strangers. When the victim entered the truck and asked for money, defendant began driving "real fast," swore at her and admonished her twice to "shut up," slapped her, and commanded her to put on handcuffs. Gary Sapp testified that the victim was scared. When she pleaded, "Please, Mister, don't," defendant replied that he was responsible for the deaths of "all them black girls that got killed out there." At the logging road, defendant pushed the victim's head down onto his penis. While the victim was performing fellatio on Larry Sapp, defendant exclaimed, "You f------ bitch," causing Larry to stop the victim from performing oral sex. After repeatedly telling Gary Sapp he was going to "ice this bitch," defendant pushed the victim onto a pile of logs and had intercourse with her again. When the Sapps were wrapping the rope around the victim and the tree, she pleaded with them not to hurt her and told them, falsely, that she had a child. When defendant observed that the Sapps had not tied the victim tighter, he became furious and yelled, "Why didn't you tie the G------ rope like I told you to?" Although the victim was a prostitute and initially sought a sexual encounter for payment, consent to sexual intercourse can be withdrawn at any time prior to penetration. *State v. Way*, 297 N.C. 293, 296, 254 S.E.2d 760, 761 (1979). Moreover, while the victim here did

not offer any physical resistance to the acts of sexual intercourse and fellatio, evidence of physical resistance is not necessary to prove lack of consent in a rape case. *Alston*, 310 N.C. at 408, 312 S.E.2d at 475 (citing *State v. Hall*, 293 N.C. 559, 563, 238 S.E.2d 473, 476 (1977)). Unlike in *Alston*, the victim's fear of defendant was specific to the events leading to defendant's sexual assaults on and murder of her. Under these circumstances, a jury could reasonably find that there was substantial evidence that the victim withdrew any prior consent to the sexual acts.

[2] In addition to requiring proof that a sexual act or intercourse was by force and against the victim's will, convictions for first-degree sexual offense and first-degree rape require proof that defendant used or displayed a deadly weapon, inflicted serious injury on the victim, or was aided and abetted in the commission of the sexual offense or rape by one or more other persons. N.C.G.S. §§ 14-27.2(a)(2), 14-27.4(a)(2). The trial court submitted the charges of first-degree rape and first-degree sexual offense on the basis that defendant was so aided and abetted. Defendant argues that the evidence was insufficient to prove that the Sapp brothers aided and abetted him because the State presented no evidence that they did anything to encourage, instigate, advise, or counsel defendant to engage in any sexual acts with the victim. Rather, the State's evidence merely proved that the Sapps were present.

Mere presence at the crime scene is insufficient to support a finding that a person is an aider and abettor; there must be some evidence tending to show that the alleged aider and abettor " 'by word or deed, gave active encouragement to the perpetrator of the crime or by his conduct made it known to such perpetrator that he was standing by to lend assistance when and if it should become necessary.' " *Bell*, 311 N.C. at 139, 316 S.E.2d at 615 (quoting *State v. Aycoth*, 272 N.C. 48, 51, 157 S.E.2d 655, 657 (1967)). In addition, to be an aider and abettor, a person must share in the criminal intent of the perpetrator to commit the charged offense. *State v. Barnette*, 304 N.C. 447, 458, 284 S.E.2d 298, 305 (1981). That a person intends to aid the perpetrator may be inferred from his actions and from his relation to the actual perpetrator. *State v. Rankin*, 284 N.C. 219, 223, 200 S.E.2d 182, 185 (1973). In fact, when the bystander is a friend of the perpetrator who knows his presence will be regarded as an encouragement, presence alone may be so regarded. *Id.* (quoting with approval Vol. 1, Francis Wharton, *Wharton's Criminal Law* § 246 (12th ed. 1932)).

STATE v. PENLAND

[343 N.C. 634 (1996)]

When viewed in the light most favorable to the State, the evidence here showed that defendant was the Sapp brothers' uncle and that the Sapps were present when defendant picked up the victim, swore at her, hit her in the face, and demanded that she put on handcuffs. Not only were the Sapps in close proximity when defendant forced the victim to perform fellatio upon him and to have sexual intercourse with him, but Larry participated in the sexual acts, and both brothers complied with defendant's request to tie the victim to a tree. Their presence inside and outside the truck while defendant engaged in sexual acts with the victim could reasonably have been regarded as encouragement to defendant and constitutes sufficient evidence that they and defendant shared the "community of unlawful purpose" necessary for aiding and abetting. *State v. McKinnon*, 306 N.C. 288, 299, 293 S.E.2d 118, 125 (1982).

[3] Defendant further argues that even if their presence was sufficient to raise an inference that they aided and abetted him, the evidence that they shared a criminal intent to commit the offenses was at best equivocal. Defendant contends that he was entitled to an instruction on the lesser offenses of second-degree rape and second-degree sexual offense. He further argues that the failure to so instruct deprived him of his state and federal constitutional rights to due process and freedom from cruel and unusual punishment. Because defendant did not object to the instructions given and did not request instructions on the lesser offenses, however, he is now barred by Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure from assigning this as error. *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993) (citing *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983)). Even under the plain error standard of *Odom*, defendant is entitled to no relief because he cannot demonstrate that any error in the trial court's instructions "caused the jury to reach a different verdict than it would have reached otherwise." *State v. Walker*, 316 N.C. 33, 40, 340 S.E.2d 80, 84 (1986). There was no evidence to support instructions on second-degree rape and second-degree sexual offense. Defendant's evidence did not tend to negate the evidence that the Sapps aided and abetted him. Rather, he stated that he did not remember the evening's events, and his testimony suggested that the Sapps were the perpetrators. Based on this evidence, the jury could have found defendant guilty of first-degree rape and first-degree sexual offense or not guilty. Because there was no evidence suggesting a lack of aiding and abetting, the trial court was not required to instruct the jury on the lesser offenses. *See State v.*

STATE v. PENLAND

[343 N.C. 634 (1996)]

*Amerson*, 316 N.C. 161, 168, 340 S.E.2d 98, 102 (1986). This assignment of error is overruled.

**[4]** Defendant next contends the evidence was insufficient to permit the jury to find beyond a reasonable doubt that he committed first-degree kidnapping. The indictment charged that defendant kidnapped the victim by "unlawfully confining her and restraining her and removing her from one place to another" without her consent and for the purpose of committing a felony, and that the victim was sexually assaulted, seriously injured, and not released in a safe place. Although defendant concedes that the evidence established that he restrained or removed the victim without her consent, he argues that the evidence was insufficient to prove that he formed an intent to rape the victim prior to or during the removal. Defendant contends that because all of the evidence tended to show that the victim got into the truck for the purpose of engaging in prostitution, defendant had no reason to believe she would not engage in consensual sexual acts, and therefore there was no substantial evidence that he formed an intent to rape the victim prior to or during the removal. We disagree.

Although the victim was a prostitute, the evidence indicates that defendant never intended to pay her for sexual services. When she entered the truck and asked for money, defendant began driving very fast. As she repeated her request for money, defendant swore at her, slapped her, and demanded that she wear handcuffs. When the victim stated, "Please, Mister, don't," defendant enhanced her fear by telling her he was responsible for the murders of "all them black girls." Defendant's repeated statements that he was going to "ice" the victim further indicated that he had no intention of paying her. Given these circumstances the jury could reasonably infer (1) that defendant would have known the victim's prior consent to sexual activity had been withdrawn, and (2) that his threats and actions compelled her submission and overcame her will, thereby negating her earlier consent. This assignment of error is overruled.

**[5]** Defendant next assigns as error the trial court's admission pursuant to N.C.G.S. § 8C-1, Rule 404(b), over his objection, of the testimony of Judy Hopkins and Gary Sapp concerning prior bad acts defendant allegedly committed. He argues that this evidence was not relevant to prove any issue of fact other than his bad character and predisposition to commit such acts and that it was admitted in violation of N.C.G.S. § 8C-1, Rule 403, because its prejudicial impact substantially outweighed its probative value.

**STATE v. PENLAND**

[343 N.C. 634 (1996)]

Following the State's assertion that it intended to offer Hopkins' testimony to prove defendant's *modus operandi* and common plan or scheme, the trial court held a *voir dire* to determine whether the acts against Hopkins and the victim were sufficiently similar under Rule 404(b) to allow admission of the testimony. Hopkins testified on *voir dire* that she dated defendant for a six-month period approximately ten years prior to trial. On their second or third date, Hopkins saw defendant with handcuffs, and he used these handcuffs to secure her "to a bed or to anything that he could get." Defendant often used a rope to bind Hopkins to a tree in the woods; and he sometimes used the handcuffs, rope, and his knife together on Hopkins. After tying her to a tree, defendant would verbally abuse her, slap her around, and throw knives at her. He also held several knives to her throat. On at least one occasion, Hopkins suffered black eyes and a torn lip. The trial court determined that defendant's actions against Hopkins and those against the victim were sufficiently similar that the ten-year span between the crimes charged and the prior bad acts did not render the evidence too remote to be probative on the issue of common plan or scheme. However, it ruled that the State could not elicit "remote" evidence from Hopkins about defendant "tying her to beds and things of that nature."

Hopkins testified before the jury that defendant controlled her by using handcuffs on her, that he had used handcuffs on more than five occasions, that he had tied her to a tree and thrown knives at her, that he had held knives at her throat, that he had called her "bitches [sic] and stuff like that," that he had slapped her and used his fist on her, and that these incidents always occurred in wooded areas. The trial court gave a limiting instruction in which it told the jury that the evidence of defendant's assaults against Hopkins "was received solely for the purpose of showing that there existed in the mind of the defendant a plan, scheme, system, or design involving the crime or crimes charged in this case."

Defendant contends that Hopkins' evidence was inadmissible to prove the existence of a common plan or scheme because of the ten-year gap between those acts and the crimes charged here and because of the dissimilarities between the two. He relies on *State v. Shane*, 304 N.C. 643, 285 S.E.2d 813 (1982), a case decided before codification of the rules of evidence, in which the defendant and a fellow police officer were charged with first-degree sexual offense for raiding a massage parlor and threatening to arrest the female employees for prostitution but then offering to drop the charges in exchange for

sexual favors. This Court held that the trial court erroneously admitted evidence that seven months prior to this incident, a prostitute allegedly committed fellatio upon the defendant in exchange for his agreement not to arrest her. Despite the "striking similarity" between the two events, the Court determined that the seven-month time gap between the events "substantially negated the plausibility of the existence of an ongoing and continuous plan to engage persistently in such deviant activities." *Id.* at 656, 285 S.E.2d at 821.

Initially, we note that at trial defendant argued that the prior bad acts were too dissimilar to be admissible under Rule 404(b), not that they were too remote in time. In his brief he primarily contends that the prior bad acts against Hopkins were too remote in time to be admissible as evidence of a common plan or scheme. Because this argument is made for the first time on appeal, it is not properly before this Court. *See State v. Robbins*, 319 N.C. 465, 495-96, 356 S.E.2d 279, 297-98, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987); N.C. R. App. P. 10(b)(1).

Even if defendant had preserved this argument, he would not prevail. As the trial court noted, both incidents involved assaults on a female in remote wooded areas in which defendant used a knife to threaten or intimidate the female, tied her to a tree, and slapped or beat her. Moreover, defendant used handcuffs and verbally abused his victim in both instances. Given the commonality of the distinct and bizarre behaviors, the ten-year gap between the incidents did not "negate[] the plausibility of the existence of an ongoing and continuous plan to engage . . . in such . . . activities." *Shane*, 304 N.C. at 656, 285 S.E.2d at 821.

Nor did the admission of Hopkins' testimony violate Rule 403. The trial court specifically precluded the prosecutor from eliciting "remote" evidence from Hopkins, and the evidence actually adduced did not simply imply that defendant had a bad character, but tended to prove the existence of a common plan or scheme on his part. In light of the limiting instruction, the probative value of Hopkins' evidence was not substantially outweighed by its prejudicial impact.

[6] Under this same assignment, defendant argues that the trial court erred in allowing Gary Sapp to testify, over objection, that whenever he previously accompanied defendant to the Fultz residence, defendant always told Darrell Fultz that he was going to handcuff Sherry Fultz and "beat the hell out of her." Defendant again contends this evidence should not have been admitted because it was not

relevant to prove anything other than his bad character. However, the State had previously introduced testimony of three sisters that defendant possessed handcuffs or had threatened to use handcuffs on them. One, Mary Wilson, testified that approximately two years before 30 November 1992, defendant and Debbie Wilson argued, and defendant handcuffed and slapped Debbie. Darrell and Sherry Fultz later testified that on 30 November 1992, defendant told Darrell he had handcuffs in his truck if Darrell wanted to "take care of" Sherry. Defendant did not object to any of this evidence. As this similar evidence was admitted without objection, defendant cannot now complain about the admission of Gary Sapp's testimony regarding defendant's proposed handcuffing of Sherry Fultz. *See State v. Alford*, 339 N.C. 562, 569-70, 453 S.E.2d 512, 515-16 (1995). This assignment of error is therefore overruled.

[7] Defendant next argues that the trial court erred in allowing State's witness Jason Duncan to testify to his opinion regarding the good character of the Sapp brothers for truthfulness. At trial defendant offered evidence of his good character for truth and veracity and the Sapp brothers' bad character for such. As Duncan had been the Sapp brothers' teacher in the sixth grade approximately six years prior to trial, defendant argued that Duncan's knowledge was so remote that his testimony should not be admitted. The trial court permitted Duncan to testify over objection that in the sixth grade, the Sapp brothers admitted exactly what they had done when they were caught. On cross-examination Duncan admitted that he did not know the brothers' current reputation for truthfulness. The fact that Duncan's knowledge of the Sapp brothers' reputation for truthfulness related to a time six years earlier affected only weight, not admissibility. *See State v. Syriani*, 333 N.C. 350, 377, 428 S.E.2d 118, 132, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Further, given the inconsequential nature of this testimony, defendant has failed to demonstrate that the error, if any, in admitting it was prejudicial.

[8] Defendant next assigns as error the trial court's refusal to instruct the jury that the State had the burden of proving beyond a reasonable doubt defendant's identity as the perpetrator. Asserting that there was no direct evidence that he killed the victim, defendant requested that the trial court instruct in accordance with N.C.P.I.— Crim. 104.90, which provides:

I instruct you that the State has the burden of proving the identity of the defendant as the perpetrator of the crime charged beyond

a reasonable doubt. That means that you, the jury, must be satisfied beyond a reasonable doubt that the defendant was the perpetrator of the crime charged before you may return a verdict of guilty.

N.C.P.I.—Crim. 104.90 (1989). The trial court refused to give the instruction. Defendant argues that the main issue was whether he or one of the Sapp brothers killed the victim. He thus contends that he was entitled to have the substance of this instruction given.

So long as the requested instruction is given in substance, the trial court is not required to give it verbatim even when it is a correct statement of the law. *State v. Dodd*, 330 N.C. 747, 753, 412 S.E.2d 46, 49 (1992). The trial court did not err in refusing to give this instruction because defendant's identity as the perpetrator was not seriously in question. There was substantial evidence that defendant killed the victim: the Sapp brothers testified that defendant was the last person with the victim before they left the scene of the crimes; Larry testified that he observed defendant moving his arms in front of the victim; defendant admitted to the Sapp brothers that he had "iced the bitch" and that he had stabbed himself in the leg while he was stabbing the victim; defendant displayed his bloody knife to the Sapps; and both cigarette butts matching defendant's brand and a cowboy boot print were found at the crime scene. As Larry testified that defendant was the only one wearing cowboy boots, the discovery of the cowboy boot print at the crime scene refuted defendant's assertion that he was passed out in the truck at the time of the killing.

Even if identity of the perpetrator was an issue, the trial court instructed that the State "must prove . . . that the defendant is guilty beyond a reasonable doubt." In instructing on each of the offenses, the court indicated that the State was required to prove beyond a reasonable doubt that defendant committed their various elements. These instructions adequately informed the jury that the State had to prove that defendant was the perpetrator. *See State v. Williams*, 98 N.C. App. 68, 71-72, 389 S.E.2d 830, 832 (1990). Any error in the failure to give the requested instruction thus was harmless beyond a reasonable doubt. This assignment of error is overruled.

Defendant next argues that the prosecutors' guilt-innocence phase arguments contained misstatements of the law and the evidence, included statements of personal opinion and personal testimony, and were grossly improper. Although defendant did not object, he now contends that the remarks violated his state and federal rights

STATE v. PENLAND

[343 N.C. 634 (1996)]

to a fair trial such that the trial court erred by failing to intervene *ex mero motu.* We conclude that the arguments were not so grossly improper as to deny such rights and that the trial court therefore did not err by failing to intervene *ex mero motu.*

**[9]** Defendant first argues that one prosecutor's explanation of the reasonable doubt standard allowed the jury to apply an unconstitutionally lenient standard of proof in determining defendant's guilt. The prosecutor noted that it was neither possible nor necessary for the State to prove defendant's guilt beyond all conceivable doubt. Quoting from *State v. Bryant,* 282 N.C. 92, 99, 191 S.E.2d 745, 750 (1972), the prosecutor stated that reasonable doubt "is more than a possibility of innocence." He continued:

Reasonable doubt is doubt based on reason. It is a reasonable doubt as distinguished from a flimsy doubt. It is a significant and important doubt. Let me read that to you again. It is a reasonable doubt as distinguished from a flimsy one. It is an important, significant doubt. That is what reasonable doubt is. It's not a vain or imaginary doubt.

The prosecutor added that the jury should not have any reasonable, substantial, or significant doubt that defendant was the person who kidnapped, raped, and murdered the victim.

Citing *Cage v. Louisiana,* 498 U.S. 39, 41, 112 L. Ed. 2d 339, 342 (1990) (per curiam), defendant contends that the use of the terms "substantial," "important," and "significant" "suggest a higher degree of doubt than is required under the reasonable doubt standard." This Court recently rejected a similar argument in *State v. Rose,* 339 N.C. 172, 451 S.E.2d 211 (1994), *cert. denied,* —— U.S. ——, 132 L. Ed. 2d 818 (1995), affirming that "[t]he jury does not have to be absolutely certain or totally free from doubt to find a defendant guilty." *Id.* at 196, 451 S.E.2d at 225. The Court determined that the prosecutor's language there that it was sufficient if the jurors "believed basically" that the defendant was guilty did not lower the State's burden of proof in violation of the defendant's due process rights. *Id.* at 196-97, 451 S.E.2d at 225. In addition, *Cage* concerned instructions the trial court gave to the jury and is "not controlling here, where the statements complained of were made by the prosecutor during jury arguments." *State v. Jones,* 336 N.C. 490, 495, 445 S.E.2d 23, 25 (1994). The trial court properly instructed the jury on reasonable doubt as follows:

STATE v. PENLAND

[343 N.C. 634 (1996)]

> A reasonable doubt is a doubt based on reason and common sense, arising out of some or all of the evidence that has been presented, or lack or insufficiency of the evidence, as the case may be. Proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt.

This instruction cured any error in the prosecutor's closing argument and insured that defendant was not denied due process. *See Rose*, 339 N.C. at 197, 451 S.E.2d at 225.

[10] Defendant further argues that a prosecutor improperly invited the jury to infer defendant's guilt from various items of evidence indicating that defendant was a person of bad character. Defendant complains of (1) the prosecutor's arguing that defendant had two different sides and asking the jury to determine "which side was out there" on 30 November 1992; (2) the prosecutor's arguing that only police have a legitimate reason for owning handcuffs and that defendant had presented no evidence that he needed to carry a knife every day; (3) the prosecutor's arguing that defendant was the kind of person who liked to go to Patterson Avenue in Winston-Salem and that, even though he was married, defendant tried to get other women to go out with him; and (4) the prosecutor's brief comment on defendant's criminal record and time served in prison.

Counsel are generally allowed "wide latitude in the argument of hotly contested cases." *State v. Huffstetler*, 312 N.C. 92, 112, 322 S.E.2d 110, 123 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). Counsel may argue facts in evidence and all reasonable inferences to be drawn therefrom, and the propriety determination is largely in the sound discretion of the trial court. *Id.*

Each of the above comments was supported by the evidence or set forth an inference the jury could draw therefrom. Although there was evidence that defendant committed these crimes and had assaulted females in the past, defendant presented evidence that he was a good husband and had never handcuffed or threatened his wife with violence. As there was evidence that defendant was not a police officer, the prosecutor could properly comment on and question his longtime possession of handcuffs as well as his need to carry a knife on his belt at all times. There was evidence that defendant had previously been to Patterson Avenue at least once with Larry Sapp, Jr., and Donnie Penland and once with the Fultzes. There was also evidence that on the night of the crimes, defendant attempted to convince

Anita Brown to accompany him and the Sapp brothers. Finally, defendant acknowledged that he had prior convictions for breaking and entering and larceny, larceny of a vehicle, three counts of forgery and uttering, and driving while impaired. The prosecutor's remarks concerned the credibility of defendant and his testimony that he knew nothing about the crimes, rather than defendant's predisposition to commit the crimes. They were not so grossly improper as to require the trial court to intervene *ex mero motu*. This assignment of error is therefore overruled.

**[11]** Defendant next argues that the trial court failed to submit statutory mitigating circumstances supported by the evidence and that this failure deprived him of his due process rights. He first contends the court erred in failing to submit the circumstance that defendant had "no significant history of prior criminal activity," N.C.G.S. § 15A-2000(f)(1) (Supp. 1995), because the evidence would have permitted a reasonable juror to find this proven by a preponderance of the evidence. Evidence was adduced at trial that defendant had been convicted of breaking and entering and larceny, larceny of a vehicle, three counts of forgery and uttering, assault on a female, and driving while impaired. He had served at least six months in prison in 1991-92 and had been imprisoned at least three times. Defendant acknowledged that at that time he was charged with backhanding his wife in response to her choking him. He also admitted to outstanding charges of driving while impaired and driving while his license was revoked. Dr. Warren, defendant's expert in forensic psychology, opined that defendant's prior convictions were associated with his long-standing addiction to alcohol.

Defendant asserts that because of the age of some of his convictions, the allegedly nonviolent nature of all of them, and the fact that they were a product of his alcoholism, a rational juror could have concluded that he had no significant history of prior criminal activity. As support for this assertion, defendant cites *State v. Lloyd*, 321 N.C. 301, 364 S.E.2d 316, *sentence vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988), and *State v. Brown*, 315 N.C. 40, 337 S.E.2d 808 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). In *Lloyd* this Court determined that this mitigator was properly submitted over defendant's objection notwithstanding evidence of two felony convictions and seven alcohol-related misdemeanors. *Lloyd*, 321 N.C. at 312-13, 364 S.E.2d at 323-24. In *Brown* the (f)(1) mitigator was held properly submitted over objection

despite defendant's record of eighteen felony convictions. *Brown,* 315 N.C. at 62, 337 S.E.2d at 825.

Defendant's reliance on *Lloyd* and *Brown* is misplaced. In those cases the mitigator was submitted over the defendants' objections; here, it was not submitted. Further, defendant bears the burden of producing "substantial evidence" tending to show the existence of a mitigating circumstance before that circumstance will be submitted. *State v. Rouse,* 339 N.C. 59, 100, 451 S.E.2d 543, 566 (1994), *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 60 (1995). Before submitting this mitigating circumstance, the trial court must "determine whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity." *State v. Wilson,* 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988). This Court has held that similar criminal histories barred submission of the mitigator. *See, e.g., State v. McCarver,* 341 N.C. 364, 399, 462 S.E.2d 25, 44-45 (1995), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 482 (1996); *State v. Daughtry,* 340 N.C. 488, 522, 459 S.E.2d 747, 764-65 (1995), *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 739 (1996); *State v. Jones,* 339 N.C. 114, 157-58, 451 S.E.2d 826, 849-50 (1994), *cert. denied,* —— U.S. ——, 132 L. Ed. 2d 873 (1995); *Rouse,* 339 N.C. at 99-100, 451 S.E.2d at 565-66. Given the nature and extent of defendant's prior criminal history and the nature of the outstanding charges against him, the trial court properly could have found that no reasonable juror would deem defendant's criminal history insignificant. Thus, the trial court did not err in failing to submit the circumstance *ex mero motu.*

[12] By this same assignment, defendant asserts that the evidence in the light most favorable to him would have permitted a reasonable juror to find the statutory mitigating circumstance that the "murder was committed while the defendant was under the influence of a mental or emotional disturbance." N.C.G.S. § 15A-2000(f)(2). He notes that there was sentencing phase evidence that he suffered from a mixed personality disorder, that his intellectual capacity was impaired, that he was addicted to alcohol, and that each of these conditions existed prior to and at the time of the murder. Even if his alcoholism was not a mental or emotional disturbance within the meaning and intent of (f)(2), defendant argues that the other diagnoses were sufficient to require that this circumstance be submitted.

In its instructions the trial court in effect submitted this circumstance. It submitted the following nonstatutory mitigating circumstances: (1) whether the defendant suffers from low mentality or a

low intelligence quotient, (2) whether the defendant suffers from substance abuse and alcohol dependency, (3) whether the defendant suffered from an impaired capacity at the time of the crime, and (4) whether the defendant suffers from a personality disorder. The court then instructed that if one or more jurors found that defendant's low mentality or low intelligence quotient, and/or substance abuse and alcohol dependency, and/or impaired capacity, and/or personality disorder existed "so that as a result the Defendant was under the influence of a mental disturbance or emotional disturbance when he killed the victim, . . . you would so indicate by having your foreperson write 'Yes' in the space after this mitigating circumstance on the Issues and Recommendation form." The trial court similarly related these four mitigators to the mitigating circumstance in N.C.G.S. § 15A-2000(f)(6), instructing that if any of the jurors found that any of these same four mitigating circumstances existed and "impaired [defendant's] capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law," they would so indicate by having their foreperson write "Yes" in the space provided after this mitigating circumstance on the Issues and Recommendation as to Punishment form. Thus, in context, the trial court in effect submitted both the (f)(2) and (f)(6) mitigators.

Even assuming *arguendo* that the court did not, through its instructions, in effect submit the (f)(2) mitigator, the error was harmless. The jurors must have considered this evidence since they in fact found the four nonstatutory mitigating circumstances which the trial court related to (f)(2) and (f)(6): that defendant suffers from low mentality or low intelligence quotient, that defendant suffers from substance abuse and alcohol dependency, that defendant suffered from an impaired capacity at the time of the crime, and that defendant suffers from a personality disorder. Thus, the error, if any, in failing to submit the (f)(2) circumstance did not prevent any juror from considering and giving weight to the mitigating evidence and was harmless beyond a reasonable doubt. *See State v. Ward*, 338 N.C. 64, 113, 449 S.E.2d 709, 736-37 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 1013 (1995). This assignment of error is overruled.

[13] Defendant next asserts that the State's penalty phase arguments contained misstatements of the evidence and were grossly improper. The first remark to which defendant objects was:

Now, ladies and gentlemen of the jury, if you could tell me, if you could tell me, if you could show to the people in this county

beyond a reasonable doubt that letting Rex Dean Penland live guarantees he'll never kill again, can you do that? Can you really do that?

Defense counsel objected, and the trial court sustained the objection. Defendant contends that this comment suggested that the jurors would have to justify a verdict of life imprisonment to the prosecutor and the citizens of the county and that a life sentence could be justified to the public only if the jury could guarantee beyond a reasonable doubt that defendant would never kill again. Defendant further argues that the trial court should have instructed the jury to disregard the remarks.

A prosecutor's challenged remarks must be reviewed in the overall context in which they were made and in view of the overall factual circumstances to which they referred. *State v. Daniels*, 337 N.C. 243, 277, 446 S.E.2d 298, 319 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995). Prior to the challenged remark, the prosecutor noted that defendant sought to protect his own life but that "no one tried to protect Vernice Alford." Taken in context, the comments suggested that the only way to prevent defendant from killing again was for the jury to return a death sentence. This type of specific deterrence argument has been consistently upheld. *See State v. Lee*, 335 N.C. 244, 281-82, 439 S.E.2d 547, 566-67, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 162 (1994); *State v. Hill*, 331 N.C. 387, 417, 417 S.E.2d 765, 780 (1992), *cert. denied*, 507 U.S. 924, 122 L. Ed. 2d 684 (1993); *State v. Johnson*, 298 N.C. 355, 366-67, 259 S.E.2d 752, 760 (1979). Moreover, the trial court subsequently instructed that the burden was on the State to prove the existence of an aggravating circumstance which outweighed any existing mitigating circumstances and which was sufficiently substantial to warrant a recommendation of death; thus, any error in the prosecutor's argument could not have denied defendant due process and did not require a new trial. *See State v. Frye*, 341 N.C. 470, 492, 461 S.E.2d 664, 674 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 526 (1996); *Jones*, 336 N.C. at 493-96, 445 S.E.2d at 24-26.

[14] Defendant further argues that the State improperly argued that the mitigating circumstances to be submitted to the jury were in fact aggravating circumstances. Referring to the fact that defendant suffered from a personality disorder, the prosecutor argued, "And I submit to you that you've already found by your verdict in the first phase of this trial that that is not a mitigating factor." Subsequently, after

STATE v. PENLAND

[343 N.C. 634 (1996)]

reviewing the list of mitigating circumstances, the prosecutor argued, "Are those mitigating factors? Do they mitigate this? Or are they aggravating factors?" Defendant also contends that the prosecutor misstated the evidence by claiming that defendant had been diagnosed as suffering from an antisocial personality disorder and arguing, "I contend to you that it is an aggravating factor."

Defendant failed to object to any of these comments. Review, therefore, is limited to whether they were so grossly improper as to require the trial court to intervene *ex mero motu*. When read in context, the comments were attacks on the weight of the mitigating circumstances. Even assuming that they were improper, the trial court properly instructed that "[o]nly those circumstances identified by statute may be considered . . . as aggravating circumstances." The trial court then instructed on the five aggravating circumstances submitted, and only these were listed on the Issues and Recommendation as to Punishment form. Accordingly, the jury could not have considered the mitigating circumstances as aggravating circumstances, and the prosecutors' remarks could not have prejudiced defendant. Further, although Dr. Warren did not testify that defendant suffered from antisocial personality disorder, he did state that defendant had a history of antisocial acts. Under these circumstances, the prosecutor's comment referring to "antisocial personality disorder" did not require the trial court's *ex mero motu* intervention. This assignment of error is overruled.

[15] By his next assignment, defendant contends, pursuant to *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985), that prospective juror Russell Farmer was erroneously excused for cause because of his personal beliefs concerning the death penalty. Farmer stated that he was irrevocably opposed to the death penalty and could not set aside his personal conviction and vote to impose it. He admitted that there "could be some" cases in which the facts were such that he would so vote, but he later asserted that he could not follow the trial court's instructions if they required imposing the death penalty.

A prospective juror may be removed for cause because of his or her views on the death penalty if those views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). The granting of a challenge for cause

where a juror's fitness is arguable is a matter within the trial court's discretion and will not be overturned absent an abuse of that discretion. *State v. Abraham*, 338 N.C. 315, 343, 451 S.E.2d 131, 145 (1994). The record fully supports the trial court's determination that Farmer's beliefs about the death penalty would substantially impair his capacity to perform as a juror. Despite his speculation that there might be some cases in which he would agree to the death penalty, Farmer subsequently asserted that he did not think he could follow the court's instructions that required imposing a death sentence. Defendant has failed to demonstrate that the trial court abused its discretion by excusing Farmer for cause. This assignment of error is therefore overruled.

Defendant next raises several issues which he concedes this Court has decided against his position, including: (1) that he was entitled to pretrial notice of the theory on which the State intended to rely on the first-degree murder charge and of the aggravating circumstances that the State intended to prove; (2) that the aggravating circumstance that the murder was "especially heinous, atrocious, or cruel," N.C.G.S. § 15A-2000(e)(9), is vague and overbroad; (3) that North Carolina's capital sentencing scheme is unconstitutional; (4) that he should have been allowed to examine potential jurors about their understanding of the definition of a life sentence; (5) that instructing the jury that defendant had the burden of proving automatism to the satisfaction of the jury was plain error; (6) that the trial court erred in instructing the jury that it had the duty to impose the death penalty if it found that the mitigators failed to outweigh the aggravators; (7) that the trial court's definition of mitigators was error; (8) that the trial court erred in instructing that nonstatutory mitigators are not mitigating as a matter of law; and (9) that the manner in which this Court conducts proportionality review is "arbitrary or undefined." We have reviewed defendant's arguments, and we find no compelling reason to reconsider our prior holdings. These assignments are overruled.

[16]    In his final assignment, defendant contends that the death sentence was imposed under the influence of passion, prejudice, and other arbitrary factors and that it is excessive and disproportionate to the penalty imposed in other similar cases. The jury found four aggravating circumstances: that the murder was committed while defendant was engaged in the commission of first-degree rape, that the murder was committed while defendant was engaged in the commission of first-degree sex offense, and that the murder was committed while

defendant was engaged in the commission of first-degree kidnapping, all pursuant to N.C.G.S. § 15A-2000(e)(5), and that the murder was especially heinous, atrocious, or cruel, pursuant to N.C.G.S. § 15A-2000(e)(9). The jury did not find as an aggravating circumstance, pursuant to N.C.G.S. § 15A-2000(e)(4), that the murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. The jury found six of eleven mitigating circumstances submitted, including that defendant suffers from low mentality or low intelligence quotient; that defendant suffers from substance abuse and alcohol dependency; that defendant suffered from impaired capacity at the time of the crime; that as the second youngest of eight children, defendant had a difficult time growing up; that defendant suffers from a personality disorder; and that defendant grew up in an abusive situation with an alcoholic father who beat his children, including defendant. We conclude that the evidence supported the jury's finding of each aggravating circumstance. We further conclude that the jury did not sentence defendant to death under the influence of passion, prejudice, or any other arbitrary factor.

This Court's final statutory duty is to determine whether the sentence of death is excessive or disproportionate. As we recently noted:

> Proportionality review is intended to "eliminate the possibility that a sentence of death was imposed by the action of an aberrant jury." *State v. Lee*, 335 N.C. 244, 294, 439 S.E.2d 547, 573, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 162 (1994). It is also intended to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). We compare this case to others in the pool, which we defined in *State v. Williams*, 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), and *State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995), that "are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994).

*State v. Chapman,* 342 N.C. 330, 346, 464 S.E.2d 661, 670 (1995), *cert. denied,* —— U.S. ——, 135 L. Ed. 2d 1077 (1996).

Since 1 June 1977, the effective date of our capital punishment statute, this Court has found death sentences disproportionate in only seven cases: *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983). We find the instant case distinguishable from each of those cases. Significantly, this Court has never found a death sentence disproportionate in a case involving a victim of first-degree murder who was also sexually assaulted. *State v. Kandies,* 342 N.C. 419, 455, 467 S.E.2d 67, 87 (1996) (citing *State v. Payne,* 337 N.C. 505, 537, 448 S.E.2d 93, 112 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 292 (1995)).

Defendant contends that his case is comparable to *Stokes* and *Young.* Those cases are distinguishable. In *Stokes* the defendant was convicted of felony murder, and the jury found only one aggravating circumstance; here, defendant was convicted of murder based on three distinct theories, and the jury found four aggravating circumstances. In *Young,* an armed robbery-murder case, this Court noted that the jury failed to find (1) that defendant was engaged in a course of conduct that included the commission of violence against another person, or (2) that the crime was especially heinous, atrocious, or cruel, one of which is usually found in armed robbery-murder cases in which the jury recommends death. *Young,* 312 N.C. at 690-91, 325 S.E. 2d at 194. By contrast, the jury here found, based on substantial evidence, that the murder was especially heinous, atrocious, or cruel.

Defendant alleges that juries have imposed life sentences in several cases which are similar to this case. Those cases, however, are distinguishable from this one, for here the jury convicted defendant of first-degree murder on the theories of premeditation and deliberation, felony murder, *and* murder by torture. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis,* 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds,* 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Moreover, none of the cases defendant cited involved the

same four aggravating circumstances found by the jury here, and none involved a defendant who stabbed his victim fourteen times after having kidnapped, raped, and sexually assaulted her.

This case is similar to cases in which this Court has found the death penalty proportionate. In *State v. Sexton*, 336 N.C. 321, 444 S.E.2d 879, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 429 (1994), we affirmed a death sentence where the defendant strangled the victim after raping and sexually assaulting her. Although the jury found nineteen of the twenty-seven submitted mitigators, it also found three aggravators, including those in N.C.G.S. § 15A-2000(e)(5) and (e)(9). In *State v. Moseley*, 338 N.C. 1, 449 S.E.2d 412 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 738 (1995), we affirmed a death sentence where the defendant took a "trusting" woman to a secluded place and assaulted, raped, brutally beat, stabbed, and strangled her. As in *Sexton* and *Moseley*, the murder here was vicious, and the victim remained conscious for some time following the attack.

We conclude that the death sentence was not excessive or disproportionate. We hold that defendant received a fair trial and sentencing proceeding, free of prejudicial error.

NO ERROR.